17-3234-cv
*Ferreira v. City of Binghamton*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2018

(Argued: January 11, 2019          Decided: September 23, 2020)

Docket No. 17-3234

—————————————————————

JESUS FERREIRA,

*Plaintiff-Appellant,*

v.

CITY OF BINGHAMTON, KEVIN MILLER, Police Officer,

*Defendants-Appellees,*

*and*

CITY OF BINGHAMTON POLICE DEPARTMENT, JOSEPH ZIKUSKI, as Police Chief of the Binghamton Police Department, JOHN DOES 1 Through 10, whose names are fictitious and identities are not currently known, JOHN SPANO, Police Sergeant, LARRY HENDRICKSON, Police Sergeant, ROBERT BURNETT, Police Sergeant,

*Defendants.*

—————————————————————

Before:

LIVINGSTON, *Chief Judge*, LEVAL and POOLER, *Circuit Judges*.

Plaintiff Jesus Ferreira, who was shot in the stomach by City of Binghamton Police Officer Kevin Miller in the course of Miller's executing a

no-knock search warrant, appeals from the judgment of the United States District Court for the Northern District of New York (Thomas J. McAvoy, *J.*). Plaintiff alleged he was the victim of negligence on the part of both Miller and other police personnel involved in the planning of the raid. Following a jury verdict in Plaintiff's favor finding negligence against the City of Binghamton, awarding Plaintiff $3 million in damages, but a verdict in favor of Officer Miller, denying Plaintiff's claim that the officer was negligent, the City moved for judgment as a matter of law to set aside the jury verdict against it, and Plaintiff moved for judgment as a matter of law to set aside the jury verdict in favor of Miller. The district court granted the City's motion, setting aside the damage award against it, and denied Plaintiff's post-trial motion to overturn the verdict in favor of the police officer. Held, there was no error in the district court's denial of Plaintiff's motion to overturn the jury verdict in favor of Officer Miller. As to the City's motion, we conclude that the district court erred in granting judgment as a matter of law on the basis of New York's bar on claims for "negligent investigation," because that rule does not apply to Plaintiff's claim. We further conclude that Plaintiff's evidence was sufficient to support a jury finding that the City, through its employees, violated acceptable police practice, so that discretionary immunity did not apply, and that those violations caused his injury. On the other hand, we find conflicting guidance from the New York Court of Appeals as to whether the district court correctly held that Ferreira's claim was barred by New York's "special duty" rule. Because we cannot reach a confident conclusion how the highest court of New York would rule on the scope of the special duty rule, and because the issue is essentially a question of state policy, we CERTIFY a question to the New York Court of Appeals.

ALEXANDER J. WULWICK (Robert J. Genis, *on the brief*), New York, NY, *for Plaintiff-Appellant*.

BRIAN S. SOKOLOFF, Sokoloff Stern LLP, Carle Place, NY, *for Defendants-Appellees*.

LEVAL, *Circuit Judge*:

Plaintiff Jesus Ferreira appeals from the judgment of the United States

District Court for the Northern District of New York (Thomas J. McAvoy, *J.*)

in favor of defendants the City of Binghamton and Binghamton Police Officer

Kevin Miller. Ferreira, while unarmed, was shot in the stomach by Officer Miller in the course of Miller's executing a no-knock search warrant. He brought this action under 42 U.S.C. § 1983 and New York state law. His federal claim alleged that Officer Miller violated his constitutional rights by using excessive force. Under New York state law, he claimed that Miller was negligent, and that the City was liable under *respondeat superior* for Miller's negligence, as well as for the negligence of the police department in the planning of the raid.

At trial, the jury gave a verdict in Ferreira's favor against the City, finding it liable for the police department's negligence regarding the raid. At the same time, the jury found that Ferreira's own negligence was partially (10%) responsible for his injuries. It awarded him $3 million in damages. On the other hand, the jury gave a verdict in favor of Officer Miller, finding neither negligence nor use of excessive force on his part.

The City moved for judgment as a matter of law (JMOL) to set aside the verdict against it, and Plaintiff moved for JMOL (or alternatively a new trial) seeking to set aside the verdict in favor of Officer Miller. The district court granted the City's motion, setting aside the damage award against it, on the

grounds that Ferreira had failed to establish that the City owed him a "special duty," and alternatively because the City enjoyed discretionary immunity. The court denied Plaintiff's post-trial motion to overturn the verdict in favor of Officer Miller. Plaintiff appeals from those rulings.[1]

We hold that the district court did not err in denying Plaintiff's motions for JMOL or new trial. Regarding the City's motion, we find that Ferreira's evidence was sufficient to support a jury finding that certain failures on the part of the City in planning the raid violated acceptable police practice, so that discretionary immunity did not apply, and that these failures caused Ferreira's injury. On the other hand, we find conflicting guidance from the New York Court of Appeals on the question whether the so-called "special duty" requirement applies only to claims that the government was negligent in response to an ongoing or threatened injury inflicted by a third party, or whether the requirement applies also to claims, such as Ferreira's, that the government itself negligently inflicted injury. Because it is impossible to discern from precedent which of these two competing views is favored by New York's highest court, and because the question is essentially one of state

---

[1] Plaintiff does not appeal with respect to the denial of his federal claim of excessive force.

4

policy rather than law, we certify the question of the scope of the special duty requirement to the New York Court of Appeals.

# I. BACKGROUND

## A. Factual Background

On August 19, 2011, a confidential informant notified Police Officer James Hawley that Michael Pride had recently robbed local drug dealers, was armed, and was staying at his girlfriend's apartment at 11 Vine Street ("the residence"). Based on the tip, the police obtained a "no-knock" search warrant for the residence, which was signed on the afternoon of August 24, 2011. That evening, Binghamton police officers conducted an hour of surveillance of the residence from about 8:00 p.m. to 9:00 p.m. During that time, officers observed the suspect Pride and another man in front of the residence engaged in "activity consistent with a drug transaction," although they did not see weapons or drugs. (Sometime after the raid the officers determined that no drug transaction in fact took place at that time.) Pride was last seen by the officers in the Clinton Street area of Binghamton, having left Vine Street and traveled across the East Clinton Street Bridge. No additional surveillance was conducted before the raid the next morning to determine whether Pride had

returned to the apartment, and no attempt was made by Hawley, members of the SWAT unit, or others to obtain a blueprint or layout of the residence.

In light of the expectation that Pride would be armed and dangerous, the Police Department ("the Department") activated a SWAT team unit on the evening of August 24 to conduct a "dynamic entry" into the residence the following morning. In a dynamic entry, police force entry and use speed and surprise to secure an area before occupants have time to access weapons or otherwise resist. To force entry, the team planned to use a battering ram to open the front door, and then enter quickly in a tight, single-file "stack" formation. Although the Department owns heavier, two-person battering rams, the SWAT team brought only a lighter, single-person ram for the raid. The team did not bring beanbag guns, tasers, flash bangs, chemical deterrents, or other less-lethal weapons, nor did it bring ballistic shields or pole cameras. Each officer was assigned a particular position in the stack, with specific responsibilities and areas of focus upon entry to the residence. Defendant Miller was assigned the front position – to enter first once the door was breached. This is, of course, the most vulnerable and dangerous position.

In the early morning of August 25, the SWAT team arrived at the residence to execute the search warrant. The light battering ram failed, however, in the initial efforts to breach the door. According to officers on the scene, the ram operator needed as many as ten strikes, over a period of 30 seconds to a minute, to succeed in breaching the door. During that time, the officers yelled through the door to announce police presence. Once the door was eventually breached at approximately 6:37 a.m., Miller entered at the head of the stack. He immediately encountered Plaintiff Ferreira, who had slept as an overnight guest on the living room couch near the front door. Miller, according to his testimony, took two or three steps into the room and, within a couple of seconds and at a distance of three to six feet, shot Ferreira in the stomach with his assault rifle. Multiple other officers testified that the shot rang out "immediately" after the door was breached.

At trial, the parties disputed what were Ferreira's actions during the second or two after Miller's entry. Because the other officers at the scene testified that they did not see Ferreira prior to his being shot, the only testimony on this issue came from Miller and Ferreira, who disagreed in significant part.

According to Miller's testimony, as he entered the room, he saw Ferreira rising from the couch. Miller yelled "down, down, down," but Ferreira walked toward him, disobeying his command. Miller acknowledged that Ferreira did not verbally threaten Miller, or attempt to leave the room or conceal anything. According to Miller, however, Ferreira was holding a gray Xbox controller in his hand, which Miller mistook for a .38 caliber gray snub-nosed revolver. As a result, Miller believed that Ferreira posed an immediate danger to himself and the other officers, and shot him.

According to Ferreira's testimony, on the previous night he had watched a movie sitting on the couch and had used the Xbox controller to control the DVD player. He had left the controller on the floor by the couch when he fell asleep. The next morning, he awoke to the sound of yelling and banging in the hallway. Just before the door flew open, he sat up slightly from the couch, raised his arms above his head, and turned his torso slightly toward the door so that he would not be perceived as a threat. He denied having heard anyone yell "get down" before the shot. "In the same instant" that the door flew open, Miller shot him in the stomach. The officers then flipped him on his stomach on the couch, frisked him, and handcuffed him.

Ferreira testified that, while he was handcuffed on his stomach, he heard one of the officers say something to the effect of, "Why did you have that joystick in your hand?" and "Put the joystick in his hand and be quiet." That testimony, if believed, would support an inference that Miller fabricated that Ferreira had been holding the Xbox controller after the fact in order to justify the shooting.

**B. The District Court's Ruling**

The court instructed the jury that it could find the City liable for negligence either on the basis of negligence on the part of Miller in shooting Ferreira or on the basis of negligence of the other police officers in their preparation for the entry. The jury found negligence on the part of the City (partially offset by a finding of 10% comparative fault on Ferreira's part). It rendered an award of $3 million against the City. But it found no negligence on the part of Officer Miller and rendered a verdict in his favor.

In granting JMOL in favor of the City, the district court concluded that New York state law requires a plaintiff to demonstrate the existence of a "special relationship" in order to sustain the duty element of a negligence claim against a municipality, and that Ferreira had failed to adduce evidence

9

supporting such a relationship. *Ferreira v. City of Binghamton*, No. 3:13-CV-107, 2017 WL 4286626, at *5–6 (N.D.N.Y. Sept. 27, 2017). The court noted that Plaintiff was not the subject of the no-knock warrant, no evidence indicated that he ever had direct contact with the Binghamton Police or any municipal official, and no evidence indicated the City took on any particular duty toward him. The court reasoned that, because no special relationship existed, the City owed Ferreira no particular duty, and therefore his negligence claim against the municipality failed as a matter of law.

In a footnote, the court further concluded that (1) even if a special relationship existed, the City enjoyed discretionary immunity as to Miller's actions, and (2) insofar as the City's liability was predicated on a theory that it had been negligent in planning the raid, such a theory was foreclosed under New York state law. *Id.* at *6 n.3. The court noted that discretionary immunity does not apply in "situations where the employee, a police officer, violates acceptable police practice." *Id.* (quoting *Lubecki v. City of New York*, 758 N.Y.S.2d 610, 617 (App. Div. 2003)). However, because the jury found that Miller had neither been negligent or nor used excessive force, the court reasoned that his actions could not be said to violate acceptable police

practice, so that discretionary immunity protected the City with regard to those claims. The district court also concluded that Ferreira's claim of negligent planning, in addition to failing for lack of a special relationship, was foreclosed under New York state law as an impermissible claim for "negligent investigation." *Id.* (quoting *Ellsworth v. City of Gloversville*, 703 N.Y.S.2d 294, 297 (App. Div. 2000)).[2]

In denying Ferreira's motions for JMOL or new trial as to Miller,[3] the court reasoned that Miller entered the residence with reason to believe he would encounter a dangerous person, and the jury could have reasonably accepted Miller's testimony that he believed as he entered that he was in fact menaced by an armed and dangerous person. *Id.* at *5. The SWAT team had been informed, based on the tip from the informant, that Pride may have had a weapon. A jury could reasonably credit Miller's testimony that he saw Ferreira advancing on him with a device in his hand that appeared to be a

---

[2] The court did not address Defendants' argument that the verdict against the City was inconsistent with the jury's finding that Miller was not negligent because the City's liability was based on a theory of *respondeat superior*. Defendants raise that argument on appeal, and we address it below.

[3] Ferreira appeals this decision only as to his negligence claim, and not as to the battery and excessive force claims.

11

gun, and discredit Ferreira's testimony to the contrary. Although Miller's belief that he had encountered a dangerous person appears to have been mistaken, the court ruled that, given the dangerous circumstances, the mistake and resultant shooting do not "indicate that he violated the standard of care in a manner in which no reasonable juror could fail to assign him liability." *Id.* The court further concluded that even if Miller was negligent, discretionary immunity would protect him from liability because his actions did not violate acceptable police practice and were therefore protected by discretionary immunity. *Id.* at *5 n.1 (citing *Rodriguez v. City of New York*, 595 N.Y.S.2d 421, 428 (App. Div. 1993)).

Similarly, in denying Ferreira's motion for a new trial, the district court determined that the jury must have credited Miller's testimony as to the moments just before the shooting and rejected Ferreira's. It ruled that such a finding was neither "seriously erroneous" nor a "miscarriage of justice" in light of the evidence presented at trial. *Id.* at *5.

## II. DISCUSSION

We review de novo the district court's ruling on the parties' motions for judgment as a matter of law, "applying the same standards as the district

12

court to determine whether judgment as a matter of law was appropriate."

*Izzarelli v. R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 167 (2d Cir. 2013) (quoting

*Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir. 1998)). We

review for abuse of discretion the district court's ruling on motions for new

trial, *Dailey v. Societe Generale*, 108 F.3d 451, 458 (2d Cir. 1997), with the

exception that the *denial* of a motion for new trial made on the ground that the

verdict was against the weight of the evidence is not reviewable on appeal,

*Rasanen v. Doe*, 723 F.3d 325, 330 (2d Cir. 2013).

**A. Ferreira's Motion for New Trial on the Negligence Claim Against Miller and the Finding of Comparative Negligence**

Ferreira asks us to review the district court's decision to deny his

motion for a new trial as to the negligence claim against Miller. He argues

that the jury verdict in that regard was against the weight of evidence. Under

this Circuit's case law, the denial of a new trial on the ground that the verdict

was not against the weight of the evidence is not subject to appellate review.

In *Stonewall Insurance Co. v. Asbestos Claims Management Corp.*, we held that

appellate review of a district court's decision as to whether a jury verdict was

against the weight of evidence "is warranted in the rare case where a trial

judge rejects a jury's verdict as against the weight of the evidence . . . but is

13

not warranted in the far more frequent circumstance where a trial judge denies a 'weight of the evidence' challenge and leaves in place a jury verdict supported by legally sufficient evidence. In the latter circumstance, the loser's only appellate recourse is to challenge the legal sufficiency of the evidence. The loser is also entitled to argue to the trial judge that the verdict is against the weight of the evidence and to obtain a new trial if the judge can be persuaded, but the denial of that challenge is one of those few rulings that is simply unavailable for appellate review." *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1199 (2d Cir. 1995), *modified on other grounds*, 85 F.3d 49 (2d Cir. 1996); *see also Rasanen*, 723 F.3d at 330.

Among Ferreira's arguments on this appeal is that he is entitled to a new trial against Miller because the jury's verdict was "a miscarriage of justice and against the weight of evidence." The term "miscarriage of justice" is a part of the standard for a determination of whether a verdict is "against the weight of evidence"—not a separate ground for granting a new trial under Rule 59. *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002). Because the denial of such a motion is not subject to appellate review, Ferreira's contention on appeal fails.

**B. Judgment as a Matter of Law on the Negligence Claim Against Miller**

Ferreira also appeals the denial of his motion for JMOL against Miller on the negligence claim. Although he points to some compelling evidence, that evidence is not so "overwhelming" as to compel a reasonable jury to find negligence. *See SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

To show negligence under New York state law, a plaintiff must demonstrate "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995)).

Ferreira's argument essentially relies on three factors.[4] First, he points out that Miller's version of events was not corroborated by the police incident report, other officers' testimony, or expert forensic evidence, and contends that it could not have been credited by a reasonable jury. Second, Ferreira insists that the Xbox controller objectively does not resemble a gun, so that

---

[4] To the extent that Ferreira relies on evidence not specifically discussed in this section, the court finds that evidence unpersuasive.

Miller could not have credibly mistaken it for a gun (or that such a mistake would have been objectively negligent). Third, he asserts that even if Miller's testimony were credited, and even if the controller were reasonably mistaken for a gun, the circumstances were still such that Ferreira did not reasonably pose a threat to the officers and the shooting was negligent.

As to the first argument, Ferreira points to the fact that the police incident record prepared the next day by Police Officer Hawley did not say that Ferreira was standing or advancing toward Miller, disobeying Miller's commands, or holding an Xbox controller. Hawley testified that he would have included such information in the report had he known it, because it would have been "very important." Miller also had a strong incentive to record any facts that tended to justify the shooting. Miller's failure to contemporaneously record his asserted justifications for the shooting in the incident report or elsewhere argues strongly, Ferreira contends, that they were subsequently fabricated.

In support of this argument, Ferreira cites to this court's opinion in *Manhattan by Sail, Inc. v. Tagle*, 873 F.3d 177 (2d Cir. 2017) for the proposition that negligence must be inferred as a matter of law from the failure of the

16

incident report to state a non-negligent reason for Miller's actions. That, however, does not accurately describe the *Tagle* ruling. In *Tagle*, the plaintiff, a sightseeing passenger on a sailing vessel, brought a negligence suit against the operator of the vessel after a deckhand lost control of a weighted halyard, which swung free and struck her in the head. We held that the deckhand's failure, despite knowing instantly that a passenger had been injured when he lost control of the halyard, to provide any explanation to rebut the inference of his negligence, together with the failure of the defendant to offer any evidence of justification for the accident, entitled the plaintiff to judgment as a matter of law.

*Tagle*, however, did not rule that negligence was established as a matter of law merely because the incident report did not state a non-negligent reason for defendants' actions. To the contrary, we explicitly recognized that the defendants might have provided evidence *other than the incident report* sufficient to rebut negligence, but failed to do so. *Id.* at 181–82. In any case, *Tagle* does not apply in the manner Ferreira suggests. In *Tagle*, all of the evidence presented at trial supported negligence. None of the evidence supported absence of negligence. The seaman in *Tagle* did not testify to the

17

occurrence of any circumstance that justified his loss of control of the halyard. Here, in contrast, Miller's testimony, if believed, rebutted his negligence. This case would more closely resemble *Tagle* if Miller had not testified that Ferreira rose and came toward him holding the Xbox controller, but had testified instead that a person in Ferreira's position *might* have done so. And while Ferreira makes strong arguments that a factfinder had good reasons not to credit Miller's self-serving testimony, the reasons for doubting his veracity are not so strong as to make his testimony not credible as a matter of law.

Ferreira also cites a range of forensic evidence to argue that, contrary to Miller's version of events, he was lying on the couch when shot, and that the shooting was therefore negligent. He points to the conclusion of Plaintiff's expert Scott LaPoint that, based on the bullet trajectory, Ferreira could not have been standing when shot. He also claims that the testimony of Defendants' expert James Terzian supports this conclusion, because Terzian acknowledged that the existence of multiple bullet holes in Ferreira's shirt suggested that he was lying down with the shirt bunched up when he was shot. However, as Defendants point out, Terzian concluded based on "the trajectory of the wound" that Ferreira "was standing up or at least partly

standing up when he was shot and facing the shooter"; he further explained that the bullet trajectory could have changed after striking a rib. The district court noted this conflicting testimony in its opinion. A jury could have reasonably credited Defendants' expert, Terzian, and discredited inconsistent testimony from LaPoint. In other words, Defendants provided expert testimony that tended to corroborate Miller's version of events and undermined inconsistent testimony from Plaintiff's expert.

Ferreira further emphasizes that none of the other officers at the scene corroborated Miller's testimony regarding Ferreira's actions in those initial one or two seconds prior to the shooting, and argues that the absence of such corroboration establishes as a matter of law that Miller's testimony was false. However, given that the officers were positioned behind each other in stack formation and wearing bulky gear, and that the shooting took place so quickly upon entry, a jury could have reasonably concluded that other officers did not see Ferreira prior to the shooting, so that their silence on the issue shows nothing that favors either side.

Ferreira further argues that, to credit Miller's testimony that Ferreira disobeyed Miller's commands and advanced toward the officers, the jury

would have had to believe that he was "suicidal" and "had a death wish," and that it would be unreasonable for them to do so. The argument is not unreasonable, but it is not so strong as to compel disbelief of Miller. In the frightening circumstance where one is awakened from sleep by the beating down of the door, one does not necessarily behave in the most logical, best considered fashion. Ferreira's behavior, as described in Miller's version, was not so improbable that a jury could not reasonably have believed Miller's testimony.

Next, Ferreira argues that the Xbox controller looks sufficiently unlike a gun that either Miller's testimony should have been discredited, or, if believed, showed that Miller was negligent in mistaking it for a gun. We accept that some objects may be so dissimilar from a gun that, as a matter of law, they could not under the circumstances of this case have been reasonably or credibly mistaken for a gun. However, we do not find this argument persuasive with respect to the white-gray Xbox controller. Given Miller's exposure to danger of gunfire when he led the stack into the premises believed to be occupied by an armed and dangerous criminal, after at least 30 seconds of unsuccessful efforts to knock down the door, it is not inherently

improbable that he would mistake the Xbox device for a gun. Because of the botched entry, the team had lost the element of surprise, and could have expected those inside to be on alert and ready to shoot. A jury could have reasonably concluded that, upon encountering Ferreira under these frightening circumstances, Miller might credibly have believed the white-gray, handheld device was a gun. His claim of misidentification is not per se incredible, nor does it establish as a matter of law that Miller failed to exercise reasonable care under the circumstances.

Finally, Ferreira argues that, even if Miller's testimony were reasonably credited, Miller's negligence was established under Miller's version of the events. He relies on the undisputed facts that he did not verbally threaten Miller, attempt to leave the room, or conceal himself. His argument fails. If the jury believed that Ferreira was advancing on Miller, disobeying Miller's commands to get down, and holding what Miller believed was a gun, the jury could reasonably conclude that Miller was not negligent in believing himself threatened and shooting Ferreira.

While Ferreira advanced reasonable arguments to the jury which might well have persuaded them to believe his version of the events and find Miller

21

negligent, his arguments, whether assessed one-by-one or in aggregate, are not sufficient to establish either that Miller's testimony was incredible as a matter of law, or that Miller was negligent as a matter of law.[5]

### C. Judgment as a Matter of Law on Ferreira's Negligence Claim Against the City

We next consider the district court's grant of JMOL on Ferreira's negligence claim against the City. The district court held that Ferreira's assertion of negligence liability against the City fails as a matter of law because New York law requires a plaintiff to demonstrate the existence of a "special relationship" in order to sustain a negligence claim against a municipality, and Ferreira failed to show such a relationship. *Ferreira*, 2017 WL 4286626, at *5–6.[6] The court also concluded in a footnote that the City enjoyed discretionary immunity, and that Ferreira's "negligent planning"

---

[5] For substantially the same reasons, we are compelled to reject Ferreira's argument that the evidence was insufficient to support the jury's finding of Ferreira's comparative negligence.

[6] We note that although "the existence of a special relationship is a question of fact that may be properly submitted to a jury," *Velez v. City of New York*, 730 F.3d 128, 135 (2d Cir. 2013) (citing *Applewhite v. Accuhealth, Inc.*, 995 N.E.2d 131, 143–44 (N.Y. 2013)), that question was not presented to the jury in the trial.

22

claim was barred by New York's prohibition on "negligent investigation" claims against law enforcement.

We conclude as follows: (i) with respect to the district court's ruling that Ferreira's negligent planning claim against the City is barred by New York's prohibition on claims of negligent investigation, we disagree; (ii) with respect to whether the City was entitled to discretionary immunity, we conclude that discretionary immunity did not bar Ferreira's claims because certain actions of City employees in the planning of the raid violated acceptable police practice, and the jury could have reasonably concluded that those violations were a proximate cause of Ferreira's injury; and (iii) with respect to whether New York's special duty rule applies to claims of injury inflicted through municipal negligence, or applies only when the municipality's negligence lies in its failure to protect the plaintiff from an injury inflicted other than by a municipal employee, we find conflicting authority in the rulings of the Court of Appeals. Because we cannot discern from precedent which view is favored by New York's highest court, and because the issue is essentially one of state policy, we certify this question to the New York Court of Appeals.

## 1.  Discretionary Immunity

Ferreira challenges the district court's ruling that the City was entitled to judgment as a matter of law because discretionary immunity protects its actions in planning and executing the raid. We conclude that discretionary immunity does not apply because, according to the testimony of the City's own police officers, certain actions of the City's employees in the planning of the raid violated acceptable police practice.

The doctrine of discretionary immunity draws a distinction between "discretionary" and "ministerial" government acts. Where a public employee is negligent in the performance of a discretionary act (in contrast to negligent performance of a ministerial act, generally meaning conduct requiring adherence to a governing rule, with a compulsory result), discretionary immunity may protect the municipality from liability. *See Lauer v. City of New York*, 733 N.E.2d 184, 187 (N.Y. 2000). This common-law limitation on municipal liability "reflects separation of powers principles and is intended to ensure that public servants are free to exercise their decision-making authority without interference from the courts. It further 'reflects a value judgment that—despite injury to a member of the public—the broader

24

interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.'" *Valdez v. City of New York*, 960 N.E.2d 356, 362 (N.Y. 2011) (quoting *Mon v. City of New York*, 579 N.E.2d 689, 692 (N.Y. 1991)).

Discretionary immunity applies only if "the discretion possessed by [the municipal defendant's] employees was in fact exercised in relation to the conduct on which the liability is predicated." *Valdez*, 960 N.E.2d at 362 (citing *Mon*, 579 N.E.2d 689, and *Haddock v. City of New York*, 553 N.E.2d 987 (N.Y. 1990)). Otherwise-discretionary actions of municipal employees do not result in discretionary immunity for the municipality unless the injury-producing act involved "the exercise of reasoned judgment which could typically produce different acceptable results," *Valdez*, 960 N.E.2d at 364 (quoting *Tango v. Tulevech*, 459 N.E.2d 182, 186 (N.Y. 1983)), and complied with a municipality's own rules and policies, *see Johnson v. City of New York*, 942 N.E.2d 219, 222 (N.Y. 2010); *Haddock*, 553 N.E.2d at 991. In addition, in the context of police officers, courts do not apply discretionary immunity where

25

"the employee, a police officer, violates acceptable police practice." *Lubecki*, 758 N.Y.S.2d at 617; *accord Newsome v. County of Suffolk*, 971 N.Y.S.2d 208, 208 (App. Div. 2013); *Rodriguez*, 595 N.Y.S.2d at 429; *Velez v. City of New York*, 556 N.Y.S.2d 537, 539–40 (App. Div. 1990). We note that because discretionary immunity is an affirmative defense, *see Metz v. State of New York*, 982 N.E.2d 76, 78–79 (N.Y. 2012), the function of which is to preclude liability where a City employee's conduct is negligent or otherwise tortious, *see Lauer*, 733 N.E.2d at 187, the standard for conduct that "violates acceptable police practice" cannot be synonymous with conduct that would otherwise incur liability.

The actions of City police officers in planning the raid were discretionary (and not ministerial) in nature because they involved the exercise of judgment, not "direct adherence to a governing rule or standard with a compulsory result." *Tango*, 459 N.E.2d at 186. The doctrine of discretionary immunity therefore protects the City unless its officers' actions "violat[ed] [the City's] own internal rules and policies," *Johnson*, 942 N.E.2d at 222, or "acceptable police practice," *Lubecki*, 758 N.Y.S.2d at 617.

26

At oral argument, the parties were asked to submit additional letter briefs on whether the City's actions in planning the raid were contrary to established policies or procedures or violated acceptable police practice, such that they were not protected by discretionary immunity.

In its post-argument letter brief, the City contends that in order to defeat discretionary immunity, Ferreira must cite "specific departmental rules" in the form of "governing internal rules or policies," rather than "general standards outside of the police department." Appellees' Letter Br. at 2–3. In support of this argument, the City cites to language from *Johnson* referring to the violation of a "municipality's procedures" and "its own internal rules and policies." *Id.* at 2 (citing *Johnson*, 942 N.E.2d at 222). The City notes that in *Johnson* the plaintiff alleged that a police shooting violated a specific, enumerated New York City Police Department procedure. In addition, the City relies on *Malay v. City of Syracuse*, 57 N.Y.S.3d 267 (App. Div. 2017), in which a New York appellate court held that discretionary immunity could not be defeated based on an allegation that the defendant had violated a standard from a private manufacturer's chemical munitions

manual, because there was no evidence that the standard had been adopted by the defendant municipality.

The City's argument implicitly raises two related but distinct legal questions, which the New York Court of Appeals has apparently not explicitly addressed: 1) whether, to defeat discretionary immunity, a plaintiff must demonstrate that a government employee violated rules or policies that are *internally recognized* by the municipal department or entity, and 2) whether those rules or policies must be formalized, as in a written manual.

We need not reach the question whether the policy must be internally adopted by the department or municipality, because the testimony of Binghamton police officers and SWAT team members showed that the relevant policies were in fact espoused—however informally—by the City. This case is therefore unlike *Malay*, in which the plaintiff relied on a private, third-party munitions manual.

To the extent that the City argues that a plaintiff must cite to a formalized, written procedure or policy, we know of no New York precedent supporting such a rule. Moreover, we reject that argument as inconsistent with New York case law regarding discretionary immunity in general, and in

28

the police context in particular. "The defense [of governmental function immunity] precludes liability for a 'mere error of judgment' but this immunity is not available unless . . . the action taken actually resulted from discretionary decision-making—i.e., 'the exercise of reasoned judgment which could typically produce different acceptable results.'" *Valdez*, 960 N.E.2d at 364 (quoting *Tango*, 459 N.E.2d at 186). Discretionary immunity thus protects a range of government action that would otherwise be negligent or subject to liability, but which is not so unreasoned that it "could [not] typically produce different acceptable results," *see id.* Whether an action rises to this level of being so unreasoned or egregious does not depend on the existence of a formal policy to the contrary. In addition, discretionary immunity does not extend to situations where "the employee, a police officer, violates *acceptable police practice.*" *Lubecki*, 758 N.Y.S.2d at 617 (emphasis added); *accord Newsome*, 971 N.Y.S.2d at 208; *Rodriguez*, 595 N.Y.S.2d at 429; *Velez*, 556 N.Y.S.2d at 539–40. While, as discussed, this language must mean something more than ordinary negligence or *any* circumstance in which a police officer would be liable, it plainly sweeps beyond formal written policies. Moreover, the passages in *Johnson* quoted in the City's letter brief, which refer to a

29

"municipality's procedures" and "its own internal rules and policies," say nothing regarding the particular form those policies must take, nor the form of evidence necessary to demonstrate their existence. We decline the City's invitation to fashion for New York a heightened requirement that plaintiffs demonstrate the violation of a formal written policy in order to defeat discretionary immunity—particularly given that under this doctrine plaintiffs are already required to demonstrate more than is otherwise required to establish liability.

Moreover, the practical desirability of avoiding such a formalistic requirement is apparent. In the first place, under such a rule, municipalities would escape liability for negligent actions in violation of their own policies by simply declining to write those policies down – thus decreasing the likelihood of observance of the policies. In addition, there may be policies that are so obviously in the interest of public safety that they would be universally understood without need for a writing. Discretionary immunity is surely not intended to shield violations of such important policies by actions that do not reflect "the exercise of reasoned judgment which could typically produce different acceptable results.'" *Valdez*, 960 N.E.2d at 364.

Ferreira catalogs several alleged deficiencies in the City's planning and preparation for the raid, which he argues violate acceptable police practice and are therefore not protected by discretionary immunity. These include: the SWAT team's failure to bring a two-person battering ram, failure to have a backup plan, failure to bring pole cameras or under-the-door mirrors, failure to bring various less-lethal weapons or ballistic shields, failure to conduct adequate pre-raid surveillance of the residence or gather other intelligence, and failure to attempt to obtain a floor plan or layout of the residence. After a careful review of the trial record, we conclude that some of the failures he alleges as violations of acceptable police practice were not sustained by the evidence. On the other hand, Ferreira elicited sufficient evidence to support a jury finding that the City, through the actions of its employees in the police department and SWAT unit, violated established police procedures and acceptable police practice by, first, failing to conduct adequate pre-raid surveillance of the residence or gather other intelligence, and, second, failing to attempt to obtain a floor plan or layout of the residence.

Ferreira first asserts that the City violated acceptable police practice by failing to bring a heavier, two-person battering ram to break down the door

31

when the lighter ram failed. Using the lighter, one-person battering ram, the SWAT team needed numerous blows before it succeeded in breaching the door and therefore lost the element of surprise, making the police entry far more dangerous than it would have been if the door had been broken by the first blow when the occupants were asleep. The failure to bring a sufficiently heavy battering ram, according to Ferreira's argument, heightened the danger perceived by Miller upon entering and therefore contributed to causing him to shoot Ferreira.

We reject that argument. The evidence is insufficient to support a jury finding that the City's failure to bring the two-person battering ram violated acceptable police practice. There is no evidence that it is standard police practice to bring a two-person battering ram to conduct a dynamic entry, much less that it violates "acceptable practice" for police to fail to do so.[7]

---

[7] Ferreira also relies on similarly broad, indefinite principles, such as that "police are never allowed to unnecessarily expose members of community to unnecessary danger," *see* Appellant's Letter Br. at 2. A conclusion that a police officer "unnecessarily exposed members of the public to danger" is insufficient as a matter of law for a jury to conclude that the City violated acceptable police practice so as to defeat discretionary immunity. Were this not the case, then discretionary immunity would essentially serve no function, because it would be defeated in any case in which the police would otherwise be liable. While we conclude that the alleged policy that was

Captain Hendrickson testified that two-person rams are not often used because they are "big and cumbersome," and Miller testified that the one-person ram is his SWAT unit's "standard ram." Moreover, failure to bring the heavier ram could not have caused Ferreira's injury because, according to the testimony of Miller and Officer Robert Charpinsky, the hall outside the doorway was too narrow to allow use of the larger ram.

Next, Ferreira contends the City violated acceptable police practice by the SWAT team's failure to have adopted a contingency backup plan for use in the event the door was not rapidly breached. This argument fails at least for the reason that, while the team did not immediately prior to the raid adopt a particular backup plan, there was uncontroverted testimony that it had conducted "failure drills" anticipating circumstances in which an operation does not go according to plan. While no specific backup plan was adopted at the outset of this raid, the team had trained and conducted contingency exercises for such circumstances, and had such plans in place. Ferreira did not elicit evidence that acceptable practice requires police to discuss backup plans *immediately prior* to the operation in question.

---

violated need not be a formalized, written policy, *see supra*, it must be sufficiently definite so as not to devolve into general standards of care.

33

Ferreira's next argument is that the SWAT team should have been provided with less-lethal weapons in the form of bean bag guns, tasers, flash bangs, chemical restraints, or ballistic shields, and that the failure to do so resulted in his being injured more severely than necessary by Miller's shooting him with an AR-15 rifle. But Ferreira presented no evidence that acceptable police practice requires dynamic entry teams to carry such equipment. In fact, given that Pride was expected to be armed with guns, the evidence suggested that such equipment would have been inappropriate, in part because such added equipment would have been bulky and would have hampered speed and efficiency. Similarly, Hendrickson's unrebutted testimony was that "no SWAT team would ever use" an under-the-door camera or mirror during a dynamic entry.

Finally, Ferreira contends that the City violated acceptable police practice by failing to conduct adequate pre-raid surveillance and failing to obtain (or attempt to obtain) a floor plan. We agree that, in this respect, Ferreira showed a failure to conform to acceptable police practice. Chief Zikuski testified that in order for police to ensure that they do not unnecessarily expose themselves and members of the public to harm, they

34

must obtain and use all available and reliable intelligence. He testified that it would violate police "rules of the road" and professional standards to not provide police officers with sufficient and proper intelligence to perform their duties with relative safety. Hendrickson testified that proper preparation for a raid includes pre-raid surveillance of the suspects and location, and an advance site survey of the location to determine avenues of approach and escape. He agreed that it is accepted police practice to obtain, if at all possible, a sketch or photographs of the location. Hawley stated that the SWAT unit normally conducts its own reconnaissance for the type of mission. In addition, Officer Miller testified that it would be important to know before entering a residence if the people inside had serious firearms, and that it is accepted police practice for a supervisor to tell a SWAT team about any surveillance conducted, and any relevant intelligence generally, during a pre-operation briefing. As to the building layout, Zikuski agreed that it was his position as chief to "always try to find out the layout of an apartment before . . . send[ing officers] out on a mission." He agreed that doing so complies with professional police standards of care, accepted police practices, and the department's training. In addition, Hawley acknowledged that failure to

35

obtain and use adequate intelligence can unnecessarily expose members of the public to unnecessary harm, and Miller similarly testified that when officers have more intelligence they are in a better position to avoid use of dangerous force. Based on this evidence, the jury could reasonably have concluded that acceptable police practice required attempting to learn the building layout before sending out officers on a home raid mission.

Despite this evidence establishing the importance of seeking a building layout in preparation for such an operation, it appears there was no attempt to do so. Indeed, the officers who may have been responsible for this task pointed fingers at each other in their testimony, indicating both that no one sought to obtain a floor plan and that there was internal confusion as to who was responsible for this important task.

The evidence further supported a finding of inadequate surveillance to conform to acceptable practice. The sole intended purpose of the raid was to catch Pride unaware. The night before the raid, the police surveilled the residence for no more than the hour from 8:00 p.m. to 9:00 p.m. Pride was seen by the police leaving the area and heading away across the East Clinton Street Bridge. No surveillance was conducted thereafter to determine whether

he had returned before the raid was conducted. If surveillance had been conducted and showed that Pride had not returned to the apartment, the no-knock pre-dawn raid, with all of its attendant dangers, would have been pointless. (It turned out, however, that Pride had returned and was in the apartment at the time of the raid.) Because of the failure to conduct surveillance, the police also acquired no information as to how many people, and of what description, would be found in the residence. Hawley testified that, on the morning of the raid, the SWAT team had "no idea" how many people were inside the residence and whether those inside were awake or asleep. Depending on the answers to those questions, it might have been useless to conduct a dangerous pre-dawn no-knock raid that morning, or at least inadvisable to expose the officers and other persons to the inevitable risks of such an operation, as an alternative to more conservative procedures such as waiting to arrest Pride at an opportune moment, and executing the search warrant at that time.

Based on the above evidence, a jury could have reasonably concluded that the City was not only negligent but further violated acceptable police practice by failing to conduct adequate pre-raid surveillance and failing to

37

seek to obtain a floor plan of the residence. Accordingly, the City was not entitled to discretionary immunity as to these failures.

The question remains whether these failures on the part of the City to conform to acceptable police practice were a proximate cause of Miller's shooting the unarmed Ferreira. Because of the district court's erroneous ruling that the City was shielded from liability for its failures, the court never considered the question of causation. A defendant's negligence "qualifies as a proximate cause where it is a substantial cause of the events which produced the injury." *Hain v. Jamison*, 68 N.E.3d 1233, 1237 (N.Y. 2016) (internal quotation marks omitted). Although we find that Ferreira's evidence was insufficient to show that the City's failure to attempt to learn the layout of the apartment was a substantial cause of Miller's shooting Ferreira, we reach the opposite conclusion as to the City's failure to conduct additional surveillance: a jury could reasonably have concluded that this failure was a proximate cause of Ferreira's injury.

As to the floor plan, Ferreira did not elicit any evidence that possession of floor plans would have changed the course of events. Miller's testimony, which was apparently credited by the jury, was that he fired his weapon

38

because he saw a figure advancing on him, holding a gray object in his hands and disobeying Miller's commands to "get down." No evidence suggested that anything would have happened differently if the police had known in advance the layout of the premises. Although Ferreira asserts that the City's (and by extension Miller's) lack of knowledge about the floor plan "heighten[ed] the danger and increas[ed] the likelihood of . . . deadly force," we find such generalizations insufficient to show that the City's failure to attempt to obtain a floor plan was a substantial cause of the shooting.

On the other hand, as to the failure to conduct additional surveillance, we conclude that Ferreira's evidence was sufficient to support a jury finding that this failure contributed to the cause of Miller's shooting of Ferreira. Although the SWAT team was aware that a woman and child might be present in addition to Pride, there is no evidence that the SWAT team expected to encounter anyone in the apartment other than those three individuals. Moreover, Chief Zikuski agreed at trial that "who is in the apartment" can be an "important fact," that knowing the number of people in the apartment can result in a "safer operation with a greater chance of success," and that this would generally result in a "better likelihood of not

39

exposing the public to unnecessary harm." Based on this testimony, the jury could have reasonably concluded that additional surveillance would have alerted the SWAT team to Ferreira's presence, and that this would have caused the team to conduct the raid differently, or to wait until no one was present other than the regular occupants of the apartment. We conclude that Ferreira's evidence was sufficient to support a jury verdict that the City's violation of acceptable police practice was a proximate cause of his injury.

## 2. Bar on Claim for "Negligent Investigation"

The district court further concluded that Ferreira's negligence claim against the City fails as a matter of law to the extent it is based on the Department's planning of the raid because "an action for negligent . . . investigation does not exist in the State of New York." *Ferreira*, 2017 WL 4286626, at *6 n.3 (quoting *Ellsworth*, 703 N.Y.S.2d at 297). Ferreira appeals that conclusion, arguing that *Ellsworth* is inapplicable because his "negligent planning" claim relates to the operation of the raid, and does not challenge the underlying search warrant or police investigation. We agree with Ferreira that New York's prohibition on claims of negligent investigation does not bar his claim against the City.

In *Ellsworth*, the plaintiff Steven Ellsworth was arrested in Gloversville, New York for criminal trespass pursuant to an arrest warrant, and the criminal complaint was later dismissed based on the facial insufficiency of the allegations. 703 N.Y.S.2d at 295. Ellsworth subsequently sued the City of Gloversville and others, challenging the validity of the arrest warrant, and alleging false arrest and imprisonment, malicious prosecution, negligent investigation and arrest, and negligent training in investigative procedures. The trial court granted summary judgment for the defendants on all claims. The Appellate Division affirmed, holding that the evidence was insufficient as to the plaintiff's malicious prosecution and false arrest claims, and further stating, "It is well settled that an action for negligent arrest and investigation does not exist in the State of New York." *Id.* at 296–97. For that proposition, the Appellate Division cited *Hernandez v. State of New York*, 644 N.Y.S.2d 380 (App. Div. 1996) and *Higgins v. City of Oneonta*, 617 N.Y.S.2d 566 (App. Div. 1994). Both of those cases involved claims of "negligent investigation" which, alongside claims of false arrest or malicious prosecution, challenged the validity of an arrest. In explaining why a negligent investigation claim did not lie, the *Hernandez* court had observed, "New York does not recognize an

41

action alleging negligent investigation or prosecution of a crime, as the police are not obligated to follow every lead that may yield evidence beneficial to the accused." 644 N.Y.S.2d at 382. In reaching a similar conclusion, the *Higgins* court had reasoned, "Plaintiff's negligence cause of action was properly dismissed since a party seeking damages for an injury resulting from a wrongful arrest and detention is relegated to the traditional remedies of false arrest and imprisonment." 617 N.Y.S.2d at 568.

Those precedents are limited to claims challenging the validity of an arrest. They reasoned that (a) plaintiffs challenging the validity of an arrest or prosecution have no need for a claim of negligent investigation because, under New York law, they can avail themselves of claims for false arrest and malicious prosecution, and (b) apart from evaluating the existence *vel non* of probable cause, courts will not scrutinize what investigative leads police should have followed to establish or verify the basis for a warrant. In those cases, the alleged harm for which the plaintiff sought damages was the arrest itself (and subsequent detention), not the conduct of the police during or prior to the arrest.

By contrast, Ferreira's "negligent planning" claim against the City does not attack the validity of the search warrant or the lawfulness of the search, but rather alleges that negligent planning deficiencies rendered the search needlessly dangerous. The injury here is not an arrest, for which the plaintiff would be protected by other theories of false arrest or malicious prosecution, but the physical harm Ferreira sustained. Such a claim is not foreclosed as "negligent investigation" merely because the allegedly negligent police actions in question occurred during the course of an investigation. It is well established that New York courts recognize negligence actions against municipalities for injuries inflicted by police officers, notwithstanding the fact that they occur in the course of police investigations. *See, e.g.*, *Johnson*, 942 N.E.2d 219; *Lubecki*, 758 N.Y.S.2d 610; *Rodriguez*, 595 N.Y.S.2d 421. In sum, the *Ellsworth* line of cases is inapplicable and does not bar Ferreira's claim that negligent planning exposed him to an unreasonable risk of injury.

### 3. *Respondeat Superior*

The City contends that the verdict against it must be set aside because the jury found that Miller was not negligent, so that the City cannot be held liable for Miller's actions based on a theory of *respondeat superior*. As to

43

Ferreira's negligence claims, the verdict form asked, "Was Officer Miller negligent with respect to the incident on August 25, 2011?" *See* Verdict Sheet Form at 2, *Ferreira v. City of Binghamton*, No. 3:13-cv-107 (N.D.N.Y. Jan. 27, 2017), ECF No. 170. The jury responded, "No." The form then asked, "Is the City of Binghamton liable for negligence with respect to the incident on August 25, 2011 under a respondeat superior theory?" *Id.* The jury responded, "Yes." The City contends that, given that the verdict form stated that the City was liable in "under a respondeat superior theory," that verdict is inconsistent with the finding that Miller was not negligent and cannot stand.

The City's argument fails because although the jury found Miller was not negligent, the City may nonetheless be liable in *respondeat superior* for negligence of *other* City employees. Because the verdict form did not specify that the jury could only impose *respondeat superior* liability on the City on the basis of *Miller's* actions, and because there was sufficient evidence at trial for the jury to reasonably conclude that *other* City employees were negligent, there is no inherent inconsistency.

"When confronted with a potentially inconsistent jury verdict, the court must adopt a view of the case, if there is one, that resolves any

44

seeming inconsistency. Before a court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt to reconcile the jury's findings, by exegesis if necessary." *Turley v. Police Dep't of New York*, 167 F.3d 757, 760 (2d Cir.1999) (internal quotation marks and citations omitted). Only where a special verdict is "ineluctably inconsistent" and cannot be "harmonized rationally" does the Seventh Amendment require that judgment be vacated. *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (internal quotation marks omitted). In looking for consistency, "we bear in mind that the jury was entitled to believe some parts and disbelieve other parts of the testimony of any given witness." *Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001).

As an initial matter, we note that the remedy for an inconsistent verdict is not, as the City urges, to selectively uphold that portion of the verdict that one party prefers. "When such an inconsistency occurs, proper deference to the parties' Seventh Amendment rights to trial by jury precludes entry of a judgment that disregards any material jury finding." *Tolbert*, 242 F.3d at 74. Indeed, if the jury could only impose *respondeat superior* liability on the City on the basis of Miller's actions, one could argue no less aptly based on the

verdict here that, because the jury found the City liable, the jury must have been mistaken in finding no liability for Miller, and that the verdict should be harmonized by finding *for Plaintiff* on both claims. However, for obvious reasons, the "correct course, if the answers were ineluctably inconsistent," would not be to change the jury's reported verdict either into one finding liability against both Miller and the City or into one finding in favor of both Miller and the City, but rather to order a new trial. *Id.*

Such a remedy is unnecessary here, however, because the jury verdict is consistent. As the district court repeatedly recognized at trial, Ferreira argued that the City was liable under New York law in negligence on two separate theories: first, because of Miller's negligent shooting of Ferreira, and, second, because of the negligent planning of the raid by police personnel. With regard to the latter theory, Ferreira catalogued a list of alleged deficiencies, including, as discussed above, failure to conduct adequate surveillance and failure to obtain (or attempt to obtain) a floor plan of the residence. Allegedly negligent acts and omissions were committed by individuals responsible for planning the SWAT raid, within the scope of their employment.

46

As discussed above, Ferreira adduced evidence at trial sufficient for the jury to conclude that City employees other than Miller were negligent in the planning of the raid. Accordingly, the jury's finding that "the City of Binghamton [is] liable for negligence with respect to the incident on August 25, 2011 under a respondeat superior theory" is sufficient to encompass Ferreira's negligent planning claim, and is consistent with a finding that Miller was not negligent. The jury apparently concluded that, while Miller's decision to shoot Ferreira was objectively reasonable under the circumstances, he had been negligently placed in that unnecessarily dangerous position, with an unnecessarily heightened likelihood of shooting someone, by negligent planning on the part of other police employees.

The conclusion that the *respondeat superior* liability contemplated by the verdict form is not limited to Miller's actions but also encompasses Ferreira's negligent planning claim is further reinforced by the district court's jury charge and by other sections of the verdict form. The jury instructions made clear that the City could be liable for negligence "through the actions of its *agents*," App. at 1587 (emphasis added), and the instruction on *respondeat superior* specified that the doctrine applied because "Officer Miller *and the*

47

*other police officers* were acting in the course of official duties," App. at 1591

(emphasis added). [8] Moreover, in discussing an appropriate jury charge, the

district court acknowledged both theories of the City's negligence and stated

that it would put both to the jury. However, the question about the City's

*respondeat superior* liability was the only place on the verdict form that the jury

could find the City liable for negligence. There was no separate "negligent

planning" section on the jury form, indicating, in light of the court's prior

statement, that the single question regarding the City's negligence was meant

to encompass both Miller's shooting and the planning of the raid by other

officers. There is no reason to believe the jury understood it otherwise.

The City asserts that a *respondeat superior* claim cannot survive unless

based on a demonstrated entitlement to recover against its employee. This is

certainly correct. Nonetheless, the plaintiff is not obligated to sue the

employee in order to obtain *respondeat superior* liability of the employer. *See,*

*e.g.*, *Trivedi v. Golub*, 847 N.Y.S.2d 211 (App. Div. 2007); *Rock v. County of*

*Suffolk*, 623 N.Y.S.2d 9 (App. Div. 1995); *Rieser v. District of Columbia*, 563 F.2d

---

[8] Additionally, the section of the verdict form pertaining to battery asked whether the City was liable "for the damages caused by the state law battery by [Miller] *or any other officer* under a respondeat superior theory." Verdict Sheet Form at 2.

462, 469 n.39 (D.C. Cir. 1977). Even if he were so required, Ferreira *did* in fact bring suit against Chief Zikuski, Captain Hendrickson, Officer Burnett, and Officer Spano, but later stipulated to the dismissal of his claims against those defendants precisely based upon the understanding that they "were all members and employees of the City of Binghamton Police Department, and were all acting within the scope of their employment, and the City of Binghamton and Binghamton Police Department are vicariously responsible and liable for all their acts and omissions, if any, made in connection with the above encaptioned matter." Stipulation of Partial Discontinuance at 1, *Ferreira v. City of Binghamton*, No. 3:13-CV-107 (N.D.N.Y Jan. 8, 2015), ECF No. 42. In other words, Ferreira brought suit against these other employees, but agreed to dismiss them as defendants on the understanding that the City would be liable under *respondeat superior* for their actions, so that it was redundant and unnecessary to name them separately as defendants.

In sum, the jury's conclusion that Miller was not negligent is in no way inconsistent with its conclusion that the City was negligent "under a

49

respondeat superior theory": we must assume that the jury found the City vicariously liable for negligent planning of the raid by other employees.[9]

### 4. *Salim* and *Mendez*

The City further argues that Ferreira's negligent planning claim fails as a matter of law, first, citing *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996), because the "actions leading up to the shooting are irrelevant to the objective reasonableness of [the officer's] conduct at the moment he decided to employ deadly force," and because such a claim runs afoul of the U.S. Supreme Court's decision in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). This argument misses the mark because Ferreira's claim is not that Miller's decision to shoot him was itself negligent, due to the City's prior failures in planning the raid; rather, his claim is the City was negligent in its planning of the raid, and that this negligence played a part in causing Miller to shoot Ferreira.

*Salim* and *Mendez* do not support the City's argument. In *Salim*, the mother of a juvenile brought a Fourth Amendment excessive force claim

---

[9] If the City was concerned that the jury might have imposed liability on it for Miller's shooting of Ferreira without finding negligence on Miller's part, the proper course would have been to ask the trial judge to inquire of the jury on which of the possible bases it found the City liable.

regarding an altercation in which her son was shot and killed by a police officer. Under the *plaintiff's* statement of facts, "at the moment [the officer] fired his weapon, [the juvenile] was actively resisting arrest, and [the officer] was being pummelled by more than five people" who were trying to prevent the arrest. 93 F.3d at 91. "The police officer subsequently shot [the juvenile] 'instinctively' in reaction to seeing [the juvenile's] hand on the barrel of his gun while the two were locked in a struggle." *Id.* Although the officer's decision to use deadly force was clearly reasonable at the moment it occurred, the plaintiff argued that he was "liable for using excessive force because he created a situation in which the use of deadly force became necessary," due to "failing to carry a radio or call for back-up, and also for failing to disengage when the other children entered the fray." *Id.* at 92. Given that the plaintiff's claim was not negligence but violation of the Fourth Amendment by using excessive force, our Circuit rejected this argument, holding that "[the officer's] actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force. The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the

51

split-second decision to employ deadly force." *Id*. Because it was "objectively reasonable" for the officer to believe at the time of the shooting that his actions did not violate the juvenile's Fourth Amendment rights, he was entitled to qualified immunity. The court further noted, "even if plaintiff conclusively established that [the officer] acted negligently, an issue on which we express no opinion, a claim that a state actor acted negligently does not state a deprivation of constitutional rights." *Id.*

Our conclusion is reinforced, not undermined, by the *Mendez* decision. In that case, the Supreme Court considered the Ninth Circuit's "provocation rule," under which "an officer's otherwise reasonable (and lawful) defensive use of force is unreasonable as a matter of law, if (1) the officer intentionally or recklessly provoked a violent response, and (2) that provocation is an independent constitutional violation." 137 S. Ct. at 1545. There, two police officers entered a shack in the rear of a residence without a search warrant and without knocking or announcing their presence. *Id.* at 1544–45. One of the plaintiffs, who mistakenly believed the noise was made by a fellow resident, reached for a BB gun to help lift himself out of bed. The officers, seeing the BB gun, mistook it for a rifle, and fired several rounds, injuring the plaintiffs. The

district court concluded, and the Ninth Circuit affirmed, that, although the officers' shooting was otherwise reasonable under the applicable standard for excessive force, the officers *had* engaged in excessive force under the provocation rule due to the prior warrantless entry.

The Supreme Court reversed, rejecting the provocation rule as inconsistent with its Fourth Amendment excessive force jurisprudence. As the Court explained, its "case law sets forth a settled and exclusive framework for analyzing whether the force used in making a seizure complies with the Fourth Amendment," which looks at "the information the officers had when the conduct occurred." *Id.* at 1546–47 (quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)). "The basic problem with the provocation rule," however, "is that it fails to stop there." *Id.* Instead, "it instructs courts to look back in time to see if there was a *different* Fourth Amendment violation that is somehow tied to the eventual use of force. That distinct violation, rather than the forceful seizure itself, may then serve as the foundation of the plaintiff's excessive force claim. . . . This approach mistakenly conflates distinct Fourth Amendment claims." *Id.* at 1547 (emphasis in original). Yet, as *Mendez* noted, there is "no need to distort the excessive force inquiry" or to "dress up every Fourth Amendment

53

claim as an excessive force claim" in order to "hold law enforcement officers liable for the foreseeable consequences of all of their constitutional torts." *Id.* at 1548. "[I]f the plaintiffs . . . cannot recover on their excessive force claim, that will not foreclose recovery for injuries proximately caused *by the warrantless entry.* The harm proximately caused by these two torts may overlap, but the two claims should not be confused." *Id.* (emphasis in original).

Far from supporting the City's argument, *Mendez* clarifies that even where there is no viable constitutional claim of excessive force, an officer's use of force may give rise to damages where it was proximately caused by other tortious conduct. The problem with the provocation rule, then—like the problem with the plaintiff's theory in *Salim*—was that it impermissibly expanded the relevant time frame *for the excessive force inquiry*, and thus "dressed up" a different (permissible) claim as a claim of excessive force. Here, Ferreira's negligent planning claim is separate from his claim of excessive force, and, as *Mendez* makes clear, is not dependent on a conclusion that Miller engaged in excessive force.

### 5. Special Duty Rule

Finally, the district court concluded that Ferreira's negligence claim against the City fails as a matter of law because Ferreira did not show that the City owed him a "special duty." In the district court's view, such a showing was necessary to sustain a negligence claim against a municipality. The court explained, "When a municipality . . . acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party," which "must be more than that owed the public generally." *Ferreira*, 2017 WL 4286626, at *5 (internal quotation marks omitted) (quoting *Velez v. City of New York*, 730 F.3d 128, 135 (2d Cir. 2013)).

To demonstrate such a duty, according to the district court's analysis based on our ruling in *Velez v. City of New York*, a plaintiff must show "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Id.* at *6 (quoting *Velez*, 730 F.3d at 135)**.**

There is no dispute that a special relationship did not exist between Ferreira and the City. Rather, Ferreira makes two arguments as to why the special duty requirement does not apply to his claim against the City. First, he argues that this requirement is inapplicable because the City's conduct in planning the raid, or Miller's conduct during the raid, violated "acceptable police practices" and "established procedures and guidelines," and, in such circumstances, no special duty is required. Br. Appellant at 45–46 (citing, *inter alia*, *Lubecki*, 758 N.Y.S.2d at 617, and *Rodriguez*, 595 N.Y.S.2d 421). Second, he argues that "where the police inflict the injury," as opposed to where they negligently fail to provide police protection, "there is no requirement for a special duty." *Id.* at 50 (citing *Ohdan v. City of New York*, 706 N.Y.S.2d 419, 425 (App. Div. 2000) (Rosenberger, J.P., dissenting)).

As an initial matter, the district court did not correctly identify the standard for demonstrating the existence of a special duty. The New York Court of Appeals has specified that a special duty can arise in three situations: "(1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive

control of a known and dangerous safety condition." *Applewhite v. Accuhealth, Inc.*, 995 N.E.2d 131, 135 (N.Y. 2013). The four-part test quoted by the district court from *Velez* applies only to the second circumstance—to determine whether a government entity has "voluntarily assume[d] a duty to the plaintiff." *See Coleson v. City of New York*, 24 N.E.3d 1074, 1077–78 (N.Y. 2014) (quoting *Cuffy v. City of New York*, 505 N.E.2d 937, 940 (N.Y. 1987)). A plaintiff may separately satisfy the special duty requirement by showing that "the plaintiff belonged to a class for whose benefit a statute was enacted," or that "the municipality took positive control of a known and dangerous safety condition." *Applewhite*, 995 N.E.2d at 135.

In any event, Ferreira's *first* argument that no special relationship was required because the conduct of City employees violated acceptable police practice fails. As Defendants correctly note, plaintiff's argument conflates the special duty rule with the rule of discretionary immunity. Under the latter doctrine, acts that would otherwise be discretionary are deemed to have not been an actual exercise of discretion, and therefore not protected by immunity, where they violate a municipality's "internal rules and policies," *Johnson*, 942 N.E.2d at 222, or "acceptable police practice," *Lubecki*, 758

57

N.Y.S.2d at 617; *accord Newsome*, 971 N.Y.S.2d at 208; *Rodriguez*, 595 N.Y.S.2d at 429; *Velez v. City of New York*, 556 N.Y.S.2d at 539–40. However, because the special duty rule "operates independently of the governmental function immunity defense," *Valdez*, 960 N.E.2d at 363, whether government conduct was contrary to acceptable police practice is inapposite to determining whether a special duty was required or in fact existed.

As to Ferreira's second argument—that the special duty requirement applies only in cases in which the allegedly negligent government conduct is the failure to protect from or respond adequately to a separately imposed injury, but does not apply where the negligent conduct alleged involves the municipal government's own infliction of injury—we find conflicting guidance from the New York Court of Appeals.

On the one hand, Ferreira's interpretation comports with both the longstanding practice of the Court of Appeals in applying the special duty requirement and the Court's articulated rationale for that requirement. The Court of Appeals has long applied the special duty requirement to suits involving third-party-inflicted injury, and it has long *not* applied the requirement to claims that the government itself negligently injured the

58

plaintiff. This decades-long decisional pattern suggests that Ferreira's interpretation of the special duty rule is correct, and that there is no requirement to establish a special duty when the alleged injury is inflicted by a municipal employee. This interpretation, moreover, is consistent with the stated rationale for the rule, which seeks to shield the government's decisions on the allocation of its limited protective resources and to prevent the government from becoming an insurer against harm inflicted by third parties.

On the other hand, more recently, the Court of Appeals has frequently stated in dictum that the special duty requirement applies whenever the municipality acts in a governmental capacity. Read literally, these dicta suggest that the special duty requirement applies regardless of whether the alleged injury is inflicted by a municipal employee or by a third party, so long as the government-defendant was acting in a governmental capacity. Moreover, the Court of Appeals has, in at least one case, applied the special duty requirement to dismiss a claim of injury inflicted by municipal employees. *See Lauer*, 733 N.E.2d at 189.

We are inclined to think that Ferreira's interpretation of the special duty rule is more logical—and more consistent with the rule's stated

rationale—than the broader version of the rule favored by the City, which would immunize a municipality from liability in many cases in which its employee or agent negligently inflicts harm. Nevertheless, because it is impossible to discern from precedent which view is favored by New York's highest court, and because the issue is more a question of state policy than law, we certify the question of the applicability of the special duty requirement to the New York Court of Appeals.

In order to understand the conflicting guidance regarding the applicability of the special duty requirement, we look to how the New York Court of Appeals has shaped the complex doctrine of exceptions to municipal liability.

The State of New York in 1929 generally waived its sovereign immunity from suit (and by extension the immunity of its municipalities). *See Schuster v. City of New York*, 154 N.E.2d 534, 538 (N.Y. 1958) (citing section 8 of the Court of Claims Act of 1929). New York courts have long recognized that, based upon this waiver, municipalities may be liable in negligence for the actions of their employees. *Bernardine v. City of New York*, 62 N.E.2d 604, 605 (N.Y. 1945) (recognizing that, based on this waiver of sovereign immunity,

"the civil divisions of the State are answerable . . . for wrongs of officers and employees"). The Court of Appeals in *Bernardine* thus held that, due to this waiver, the City of New York could incur liability in negligence for injuries sustained from a runaway police horse. *Id.*

Nonetheless, the Court of Appeals has applied a number of restrictions on municipal liability for negligence of municipal employees. *See Haddock*, 553 N.E.2d at 990–91 ("Despite the sovereign's own statutory surrender of common-law tort immunity for the misfeasance of its employees, governmental entities somewhat incongruously claim—and unquestionably continue to enjoy—a significant measure of immunity fashioned for their protection by the courts."). First, New York courts have retained "the common-law doctrine of governmental immunity [which] shield[s] public entities from liability *for discretionary actions* taken during the performance of governmental functions." *Valdez*, 960 N.E.2d at 361 (emphasis added). As discussed above, discretionary immunity may protect the municipality from liability for discretionary (as opposed to ministerial) acts. *See Lauer*, 733 N.E.2d at 187. Otherwise-discretionary actions of municipal employees are not protected by discretionary immunity, however, if they fail to comply with

61

a municipality's own rules and policies, *see Johnson*, 942 N.E.2d at 222; *Haddock*, 553 N.E.2d at 991, or if they "violate[] acceptable police practice," *Lubecki*, 758 N.Y.S.2d at 617; *accord Newsome*, 971 N.Y.S.2d at 208; *Rodriguez*, 595 N.Y.S.2d at 429; *Velez*, 556 N.Y.S.2d at 539–40.

The Court of Appeals has articulated another doctrine related to suits to hold a municipality liable for the negligence of its employees: the so-called "special duty" requirement. As with any negligence claim, a plaintiff who sues a municipality for negligence cannot recover unless she demonstrates the existence of a duty on the part of the municipality running to the plaintiff. *See Lauer*, 733 N.E.2d at 187, 190. The special duty rule provides that, "[t]o sustain liability against a municipality, the duty breached must be more than that owed the public generally." *Id.* at 188. Under this rule, to establish such a negligence claim, the plaintiff must show that the government owed "a special duty to the injured person, in contrast to a general duty owed to the public." *McLean v. City of New York*, 905 N.E.2d 1167, 1171 (N.Y. 2009) (quoting *Garrett v. Holiday Inns, Inc.*, 447 N.E.2d 717, 721 (N.Y. 1983)).[10] New

---

[10] When a municipality is engaged in a "proprietary" rather than a "governmental" role, it is subject to the ordinary of rules of negligence that apply to private parties, so that neither discretionary immunity nor the

York courts have recognized the existence of such a duty where either "(1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition." *Applewhite*, 995 N.E.2d at 135. Unlike discretionary immunity, which is an affirmative defense, the existence of a special duty "is an essential element of the negligence claim itself," which the plaintiff must prove. *Id.*

The special duty requirement "is derived from the principle that a municipality's duty to provide police protection is ordinarily one owed to the public at large and not to any particular individual or class of individuals," and that "a municipality's provision of police protection to its citizenry has long been regarded as a resource-allocating function that is better left to the discretion of the policy makers." *Cuffy*, 505 N.E.2d at 940. It "springs from a

---

special duty rule apply. *See Applewhite*, 995 N.E.2d at 134. "A government entity performs a purely proprietary role when its activities essentially substitute for or supplement traditionally private enterprises"; by contrast, it performs a governmental role "when its acts are undertaken for the protection and safety of the public pursuant to the general police powers." *Id.* (internal quotation marks omitted). Policing is a "long-recognized, quintessential governmental function[]." *Id.*; *accord Velez*, 730 F.3d at 134–35.

recognition that the City has limited resources and cannot be in all places at one time." *Rodriguez*, 595 N.Y.S.2d at 425.

Courts have thus applied the special duty rule in cases involving the government's alleged failure to adequately protect from or respond to injuries inflicted by third parties including domestic partners, *see Coleson*, 24 N.E.3d 1074 (N.Y. 2014); *Valdez*, 960 N.E.2d 356 (N.Y. 2011); *Yearwood v. Town of Brighton*, 475 N.Y.S.2d 958 (App. Div. 1984); *see also Riss v. City of New York*, 240 N.E.2d 860 (N.Y. 1968) (attacker hired by rejected suitor), abusive parents, *see Sorichetti v. City of New York*, 482 N.E.2d 70 (N.Y. 1985), daycare providers, *see McLean*, 905 N.E.2d 1167 (N.Y. 2009), criminals, *see Velez*, 730 F.3d 128 (2d Cir. 2013); *De Long v. County of Erie*, 457 N.E.2d 717 (N.Y. 1983); *Schuster*, 154 N.E.2d 534 (N.Y. 1958), classroom students, *see Dinardo v. City of New York*, 921 N.E.2d 585 (N.Y. 2009), building tenants, *see Cuffy*, 505 N.E.2d 937 (N.Y. 1987), livestock in the middle of a highway, *see Shinder v. State of New York*, 468 N.E.2d 27 (N.Y. 1984) (bull); *Napolitano v. County of Suffolk*, 462 N.E.2d 1179 (N.Y. 1984) (horse), intoxicated drivers, *see Evers v. Westerberg*, 329 N.Y.S.2d 615 (App. Div. 1972), *aff'd*, 296 N.E.2d 257 (N.Y. 1973), and private taxicabs, *see Florence v. Goldberg*, 375 N.E.2d 763 (N.Y. 1978).

By contrast, in cases where plaintiffs seek to hold municipalities liable for injuries inflicted by negligent acts of municipal employees, although applying discretionary immunity where appropriate, New York courts have generally *not* applied the special duty rule. *See Johnson*, 942 N.E.2d 219 (N.Y. 2010) (police shooting of bystanders during shootout); *McCummings v. N.Y.C. Transit Auth.*, 613 N.E.2d 559 (N.Y. 1993) (shooting of fleeing criminal suspect by municipal officer); *Mon*, 579 N.E.2d 689 (N.Y. 1991) (probationary police officer shooting of two suspects); *Meistinsky v. City of New York*, 132 N.E.2d 900 (N.Y. 1956) (police shooting of robbery victim); *Flamer v. City of Yonkers*, 127 N.E.2d 838 (N.Y. 1955) (police shooting of man who made disturbance while intoxicated); *Wilkes v. City of New York*, 124 N.E.2d 338 (N.Y. 1954) (police shooting of bystander); *Haddock v. City of New York*, 532 N.Y.S.2d 379 (App. Div. 1988), *aff'd*, 553 N.E.2d 987 (N.Y. 1990) (Parks Department employee rape of plaintiff); *Lubecki*, 758 N.Y.S.2d 610 (App. Div. 2003) (police shooting of hostage); *Rodriguez*, 595 N.Y.S.2d 421 (App. Div. 1993) (police shooting of bystander during shootout).[11]

---

[11] To be sure, in *Johnson* and *Mon*, the Court of Appeals held that the defendants' actions were protected by discretionary immunity, so there was arguably no need to discuss whether the plaintiffs had adequately established

For example, in *Haddock*, the plaintiff claimed that the city had negligently retained a Parks Department employee after learning of his violent past, which resulted in her being raped by the employee in a public park. As in our case, the *Haddock* trial court granted the defendant city's post-trial motion for judgment notwithstanding the verdict, on the basis that the city owed no special duty to the plaintiff. The Appellate Division reversed, explaining that the special duty rule had no application to such facts, and the Court of Appeals affirmed the Appellate Division (although without further discussion of the special duty rule). *See Haddock*, 532 N.Y.S.2d 379, *aff'd*, 553 N.E.2d 987.

Similarly, in *McCummings*, the Court of Appeals upheld municipal liability based on negligence of an officer of the New York City Transit Authority who had shot the plaintiff, a fleeing robbery suspect. *McCummings*, 613 N.E.2d at 560–62. The theory of the case, as submitted to the jury, was common law negligence. *Id.* at 560. The Court of Appeals upheld the jury

a special duty. *See Johnson*, 942 N.E.2d at 222–23; *Mon*, 579 N.E.2d at 694. In the other cases cited, however, the court permitted the plaintiffs to recover without requiring proof of a special duty.

award for the plaintiff without addressing whether the officer owed him a special duty. *Id.*

The rulings of the Court of Appeals in *Haddock* and *McCummings* are consistent with the stated rationale of the special duty rule: where government employees have inflicted the injury, municipal liability is not based on an alleged misallocation of protective resources. While the special duty rule is necessary in the context of third-party-inflicted harm because "a different rule 'could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits,'" *Sorichetti*, 482 N.E.2d at 75 (quoting *Riss*, 240 N.E.2d at 861), this concern is absent when the government itself inflicts the injury. The *Haddock* and *McCummings* line of cases, therefore, along with the underlying rationale for the special duty rule as articulated by the Court of Appeals, supports Ferreira's argument that the special duty requirement has no applicability in a case in which the harm is inflicted by governmental actors.

It should be stressed that Ferreira's proposed rule does not depend on the distinction between "misfeasance" and "nonfeasance," a distinction that the Court of Appeals has declared to be irrelevant to the special duty analysis.

The City incorrectly characterizes Ferreira as arguing that the special duty requirement does not apply to cases of police "misfeasance," while correctly noting that this court, following the Court of Appeals, has rejected such a rule.

In *Velez v. City of New York*, New York City police officers received a tip from a former police informant, Anthony Velez, that he had seen drugs and weapons at an apartment. 730 F.3d at 131. In response, police conducted a search of the apartment. *Id.* at 132. The commanding officer recognized Velez at the scene, and had another officer hold him in the hallway. The officers arrested two people, but did not arrest Velez. After the police left, Velez was shot outside the entrance of the apartment and died. His mother brought suit against the City of New York, arguing that, by not arresting Velez, the police officers had negligently disclosed that he was an informant, resulting in his murder. The plaintiff argued that she did not need to demonstrate the existence of a special duty because the actions of the police officers constituted affirmative misconduct, rather than a failure to act. The court disagreed, citing *Applewhite v. Accuhealth, Inc.* for the proposition that a special duty is still required when the alleged negligence involves

"misfeasance" rather than "nonfeasance." *Id.* at 136. Accordingly, it held that the special duty rule was applicable.

In *Applewhite*, the plaintiff, a 12-year-old girl, suffered anaphylactic shock in her home after being administered an apparently noxious medication by a visiting nurse. The plaintiff's mother called 911, and two emergency medical technicians (EMTs) employed by the city arrived at her home. They administered treatment, but declined the mother's request to take the girl immediately to a nearby hospital. The plaintiff suffered brain damage. The plaintiff argued that because the EMTs' actions there involved "misfeasance" rather than "nonfeasance"—that is, wrongful action in the administration of treatment, rather than the failure to act—the special duty requirement did not apply. The Court of Appeals ruled that the special duty rule did apply. In a footnote, it rejected the plaintiff's argument, stating, "Contrary to the parties' arguments, our precedent does not differentiate between misfeasance and nonfeasance, and such a distinction is irrelevant to the special duty analysis." 995 N.E.2d at 135 n.1.

The City's reliance on *Velez*, and by extension *Applewhite*, is misplaced. In both cases, the theory of liability was municipal failure to protect against

69

harm inflicted otherwise than by municipal employees. In *Applewhite*, where the actions of a non-governmental nurse had caused the danger prior to the arrival of the municipal EMT employees, the claim of municipal liability was predicated on the failure of the municipal EMTs to respond adequately to an injury inflicted by another. Similarly, in *Velez*, although the plaintiff alleged that the police officers had acted wrongfully in failing to arrest Velez, Velez's injury was inflicted by a third party.

Both cases are consistent with the rule set forth by Ferreira: both applied the special duty rule in a case involving the government's failure to respond adequately to or protect against an injury inflicted by a third party. In both cases, the fact that the allegedly negligent conduct was action, rather than inaction, was irrelevant for the special duty analysis. But Ferreira's proposed rule, consistent with the *Haddock* line of cases, turns not on whether the government conduct was "misfeasance" or "nonfeasance" but rather on *who inflicted the injury*. As the facts of *Velez* and *Applewhite* make clear, this inquiry is distinct from the misfeasance/nonfeasance distinction. Just as the government can simply fail to respond to an ongoing or threatened injury (*i.e.*, nonfeasance), it can actively respond to the injury in a negligent manner

70

(*i.e.*, misfeasance). According to Ferreira's argument, the special duty rule applies in both types of case, so long as the injury was inflicted by a third party rather than the government itself. But neither *Velez* nor *Applewhite* engaged with, much less purported to overrule, the *Haddock* line of cases, in which New York courts have declined to apply the special duty requirement to claims of government-inflicted injury.

Although the longstanding practice of the Court of Appeals and the underlying rationale for the special duty rule thus support Ferreira's reading of the rule, the Court of Appeals has frequently stated in dictum that the special duty requirement applies whenever the municipal defendant acts in a governmental capacity. Read literally, these dicta suggest that the special duty requirement applies regardless of whether the injury was inflicted by a third party or by a governmental actor, so long as the government was acting in a governmental (rather than proprietary) capacity. In addition, in at least one case involving government-inflicted injury, *see Lauer*, 733 N.E.2d 184, the Court of Appeals has applied the special duty requirement to dismiss the complaint. Thus, we cannot say with certainty that Ferreira's is the correct reading of New York law.

Noting first the Court of Appeals's broad statements in dicta of a special duty requirement without mention of its applicability only to cases where liability would be predicated on negligent failure to protect against injury inflicted by third parties, in *Florence v. Goldberg*, in 1978, the Court of Appeals wrote that "to sustain liability against a municipality, the duty breached must be more than a duty owing to the general public." *Florence*, 375 N.E.2d at 766. In *Lauer v. City of New York*, the Court of Appeals stated broadly that "[t]o sustain liability against a municipality, the duty breached must be more than that owed the public generally." *Lauer*, 733 N.E.2d at 188; *see also Connolly v. Long Island Power Auth.*, 94 N.E.3d 471, 476 (N.Y. 2018) ("Assuming the government entity was acting in a governmental [*i.e.*, not proprietary] capacity, the plaintiff may nevertheless state a viable claim by alleging the existence of a special duty to the plaintiff."); *Turturro v. City of New York*, 68 N.E.3d 693, 700 (N.Y. 2016) ("If a municipality was acting in a governmental capacity, then the plaintiff must prove the existence of a special duty."); *Applewhite*, 995 N.E.2d at 135 ("If it is determined that a municipality was exercising a governmental function, the next inquiry focuses on the extent to which the municipality owed a 'special duty' to the injured party.

The core principle is that to 'sustain liability against a municipality, the duty breached must be more than that owed to the public generally." (quoting *Valdez*, 960 N.E.2d at 361)); *McLean*, 905 N.E.2d at 1171 ("We have long followed the rule that an agency of government is not liable for the negligent performance of a governmental function unless there existed a special duty to the injured person, in contrast to a general duty owed to the public." (internal quotation marks omitted)).[12]

Almost all of these statements were made in the context of "failure to protect"-type cases. *See Connolly*, 94 N.E.3d at 474 (damage caused by failure to de-energize electrical grid in preparation for hurricane); *Turturro*, 68 N.E.3d at 697 (failure to adequately consider traffic calming measures, resulting in car accident); *Applewhite*, 995 N.E.2d at 133 (emergency medical response to anaphylactic shock caused by a non-governmental actor); *McLean*, 905 N.E.2d at 1169–70 (municipality's referral of day care provider in whose care infant

---

[12] Despite these broad statements regarding the special duty rule's applicability, in 2011 the Court of Appeals in *Valdez v. City of New York* described the rule as a "well-established ground[] for a municipality to secure dismissal of a tort claim brought against it by a private citizen *injured by a third party*." 960 N.E.2d at 361 (emphasis added). It further observed, "We have deemed it necessary to restrict the scope of duty in this manner because the government is not an insurer against harm suffered by its citizenry *at the hands of third parties*." *Id.* (emphasis added).

was injured);[13] *Florence*, 375 N.E.2d at 764 (negligent failure to station a guard at a school crossing, resulting in plaintiff's child being struck by an

<hr>

[13] The Court of Appeals wrote in *McLean* that "[g]overnment action, if discretionary, may not be a basis of liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff." *McLean*, 905 N.E.2d at 1173. That language, taken in isolation, might be read to suggest that the special duty requirement applies only to ministerial actions, and therefore does not apply to Ferreira's claim that the City's discretionary decisions in planning the raid negligently resulted in his injury, even though discretionary immunity does not apply because the City violated acceptable police practices.

That interpretation of the statement from *McLean* cannot be correct, however, as it is incompatible with the Court of Appeals's resolution of that case. The Court "assume[d], in [the plaintiff's] favor, that the conduct she complain[ed] of was ministerial," and then concluded that there could be no liability because she had not shown a special duty. *Id.* at 1174. If the special duty rule does not apply to discretionary actions, even those that are not protected by discretionary immunity, then the Court of Appeals could not have dismissed the complaint for lack of special duty by "assum[ing]," without deciding, that the tortious conduct was ministerial. It would have also been required to consider whether, if the conduct was discretionary, the City could nonetheless have been liable because it violated its own policies.

This conclusion is further confirmed by *Valdez v. City of New York*, in which the plaintiffs alleged that the police negligently failed to protect against a threatened attack. 960 N.E.2d at 359. Without deciding whether the City's conduct was ministerial or discretionary, the Court of Appeals explained, "if plaintiffs cannot overcome the threshold burden of demonstrating that defendant owed [them a special duty], there will be no occasion to address whether defendant can avoid liability by relying on the [discretionary] immunity defense." *Id.* at 365. Because the Court held that the plaintiffs' claim failed for lack of special duty, it had no occasion to address the discretionary immunity defense. *Id.* at 368; *see also id.* at 365 n.7 ("That was the situation in *McLean* . . . — [the] plaintiff[] . . . failed to establish that a special duty existed,

74

automobile). They did not involve injuries inflicted by government employees, and therefore they could not overrule the *Haddock* line of cases, which declined to apply a special duty requirement where the plaintiff's injury was inflicted by a municipal employee. Any suggestion in these cases that, contrary to the *Haddock* line, the special duty rule applies to cases of municipally inflicted injury was dictum.

In *Lauer*, however, the Court of Appeals dismissed a complaint alleging an injury inflicted by the municipality on the basis of lack of special duty. The plaintiff was investigated by police following the death of his infant son because the New York City medical examiner's *initial* autopsy report indicated that the cause of death was homicide by blunt force. 733 N.E.2d at 186. Two months after the child's death, the medical examiner changed his conclusion, now determining that a ruptured brain aneurysm caused the

---

thereby rendering any further discussion concerning the availability of the [discretionary] immunity defense unnecessary."). If it were true that the special duty requirement does not apply to discretionary actions, the lack of special duty alone would not require dismissal of the complaint.

We further note that the Court of Appeals has long applied the special duty requirement to apparently discretionary acts, such as the failure to provide police protection. *See, e.g., Cuffy*, 505 N.E.2d at 940. For these reasons, we do not understand *McLean* to hold that the special duty requirement applies only to ministerial acts.

death. The medical examiner, however, failed to correct the autopsy report or notify the police. *Id.* The police investigation continued for seventeen more months, predicated on the subsequently discredited initial autopsy report. The plaintiff sued the medical examiner and the City for, *inter alia*, negligent infliction of emotional distress based on the failure to correct the reports and accurately inform the authorities. *Id.*[14]

In discussing the element of duty, the Court of Appeals stated that "[t]o sustain liability against a municipality [for negligence], the duty breached must be more than that owed to the public generally." *Id.* at 188 (citing, *inter alia*, *Florence*, 375 N.E.2d 763). The Court continued: "Indeed, we have consistently refused to impose liability for a municipality in performing a public function absent 'a duty to use due care for the benefit of particular persons or classes of persons.'" *Id.* (quoting *Motyka v. City of Amsterdam*, 204 N.E.2d 635, 637 (N.Y. 1965)). The Court rejected the plaintiff's argument that New York City Charter § 557, which established the New York City Office of the Chief Medical Examiner and its responsibilities, provided such a duty,

---

[14] It was undisputed before the Court of Appeals that the examiner's initial error in conducting the autopsy was protected by discretionary immunity. *Lauer*, 733 N.E.2d at 186–87.

concluding that the charter provision was not enacted for the special benefit of potential suspects in criminal investigations. *Id.* at 188–89. The Court also found that the City had not voluntarily assumed a duty to him beyond that owed to the public generally, applying the four-factor *Cuffy* test. *See id.* at 189. Finally, the Court rejected the dissents' suggestion of a duty running from the City to the plaintiff based simply on the City's negligent creation of a foreseeable harm: "Nor can we agree with the dissenting Judges' proposed new duty, based on negligent initiation of a course of events with foreseeable harm. This is simply not a prudent expansion of the law." *Id.* at 190. Finding no duty running from the municipal defendants to the plaintiff, the Court ordered the dismissal of the complaint.

Thus, in *Lauer*, the Court of Appeals held that a negligence complaint failed for lack of special duty notwithstanding that the injury—emotional distress resulting from a seventeen-month police investigation—was inflicted by the government. Although *Lauer* did not address, much less purport to overrule, the *Haddock* line of cases, it nonetheless leaves in doubt the continued validity of the *Haddock* approach—that the special duty requirement applies only to cases where the claim of municipal liability is

77

predicated on the municipality's negligent failure to protect the plaintiff from harm inflicted by another.[15]

We cannot confidently predict, on the basis of Court of Appeals precedents, whether that Court will continue to consider the *Haddock* line of cases to be good law. Applying the special duty requirement to cases of government-inflicted injury would appear to extend the rule far beyond its underlying rationale, as articulated by the Court of Appeals, which recognized the need for some limitation because "the government is not an insurer against harm suffered by its citizenry at the hands of third parties." *Valdez*, 960 N.E.2d at 361; *see also Schuster*, 154 N.E.2d 534 (complaint stated a claim for negligence based on the government having undertaken a duty to protect a highly publicized informant and then failing to do so). The Court of Appeals had also explained that, because the government necessarily has limited resources to allocate for public benefit, no particular member of the public enjoys a particular claim to those resources absent some special

---

[15] To be sure, Lauer also contended that the examiner's negligence caused injuries that were inflicted by third parties, such as being ridiculed throughout New York City. *See Lauer*, 733 N.E.2d at 186. That some of Lauer's claimed injuries were inflicted by third parties has no bearing on the theory that the police investigation itself caused him emotional anguish.

relationship, and to hold otherwise "could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits," *Mastroianni v. County of Suffolk*, 691 N.E.2d 613, 615 (N.Y. 1997) (citation omitted). These concerns have no relevance where the government itself inflicts the injury. In such a case, the plaintiff is not claiming a special entitlement to resources or protection from the municipality, but rather that the government itself has culpably inflicted injury.

Moreover, to embrace Defendants' position that municipalities cannot be liable under New York law for injuries inflicted by their employees acting in a governmental capacity, absent a special duty, would shield municipalities from liability for a range of harms that may be inflicted on a member of the public in a "one-off" capacity—for instance, where police negligently shoot hostages and bystanders in ways that violate their department guidelines or acceptable police practice, *see, e.g.*, *Johnson*, 942 N.E.2d 219; *Lubecki*, 758 N.Y.S.2d 610; *Rodriguez*, 595 N.Y.S.2d 421, or where a municipality's negligence results in its employee assaulting a member of the general public, *see Haddock*, 553 N.E.2d 987. We would find it surprising that

79

the New York Court of Appeals intends to shield municipalities from liability

in these circumstances, which would go very far towards reinstituting the

very immunity that New York's legislature disavowed in 1929. We are not

persuaded that *Lauer*—or any subsequent case containing a broad statement

in dictum of the special duty rule—was intended to overturn, *sub silentio*, the

longstanding *Haddock* line of cases in which the Court of Appeals did not

apply the special duty requirement to claims of government-inflicted injury.

Based on the conflicting precedents reviewed above, we find it very difficult

to reach a conclusion on the scope of the special duty requirement—which is

more a matter of state policy than of law.

The Rules of Practice of the New York Court of Appeals provide that

we may certify a dispositive question of law to that Court "[w]henever it

appears . . . that determinative questions of New York law are involved in a

case . . . for which no controlling precedent of the Court of Appeals exists." 22

N.Y.C.R.R. § 500.27(a); *see also* 2d Cir. R. 27.2(a) (permitting certification as

provided by state law). In determining whether to exercise our discretionary

power to certify a question to the Court of Appeals, we consider "whether the

New York Court of Appeals has not squarely addressed an issue and other

decisions by New York courts are insufficient to predict how the New York Court of Appeals would resolve it; . . . whether a decision on the merits requires value judgments and important public policy choices that the New York Court of Appeals is better situated than we [are] to make; and whether the questions certified will control the outcome of the case," *Haar v. Nationwide Mut. Fire Ins. Co.*, 918 F.3d 231, 235 (2d Cir. 2019) (internal quotation marks omitted), as well as the expense and delay that certification imposes on the parties, and, in cases falling under the diversity jurisdiction of federal courts, the constitutionally recognized entitlement of a party to have the case decided by a federal court.

Here, these factors favor certification. As discussed above, we find conflicting guidance in the decisions of the Court of Appeals on the question whether the special duty requirement applies to cases of government-inflicted injury. The scope of municipal liability is essentially a question of policy that the Court of Appeals is better situated than we are to decide. *See Lauer*, 733 N.E.2d at 187. Finally, the question certified will control our disposition of the case. As discussed above, we reject the City's other arguments for upholding the district court's grant of JMOL. Thus, if Ferreira must establish a special

81

duty to sustain his claim that the City's negligent planning of the raid caused Miller to shoot him, the City is entitled to judgment as a matter of law. Otherwise, the judgment of the district court should be vacated, and the jury verdict awarding very substantial damages to Ferreira should stand.[16]

Accordingly, we respectfully request the guidance of the New York Court of Appeals, and certify to it the question set forth in the conclusion below.

We invite the Court of Appeals to reformulate or expand upon this question as it deems appropriate to determine whether Ferreira has failed to establish the City's liability for its negligence in planning the raid in view of

---

[16] We note that, under the *Haddock* approach, the special duty rule is inapplicable regardless of whether the negligent municipal action alleged is the immediate cause of injury, such as the negligent firing of a gun, or an earlier negligent action that results in a government employee inflicting injury. In *Haddock*, the plaintiff claimed that the City had negligently retained a Parks Department employee with a violent past, which resulted in her being raped by the employee while attending at a public park. The Appellate Division rejected the defendant's argument that the special duty rule applied, explaining that the case "does not . . . involve the concept of a 'special duty'" because "plaintiff is not complaining of a general failure to provide police protection, but is rather alleging the negligent retention of a dangerous employee." *Haddock*, 532 N.Y.S.2d at 381, *aff'd*, 553 N.E.2d 987. Similarly, if *Haddock* remains good law, the special duty rule is inapplicable to Ferreira's claim that the City's negligent planning caused Miller to shoot him.

the fact that, as Ferreira concedes, the City owed no special duty to him beyond the duty of care it owed to the public generally.

**CONCLUSION**

For the foregoing reasons, we certify to the New York Court of Appeals the following question:

Does the "special duty" requirement—that, to sustain liability in negligence against a municipality, the plaintiff must show that the duty breached is greater than that owed to the public generally—apply to claims of injury inflicted through municipal negligence, or does it apply only when the municipality's negligence lies in its failure to protect the plaintiff from an injury inflicted other than by a municipal employee?

It is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals this opinion as our certificate, together with a complete set of briefs, appendices, and the record filed in this case by the parties. The parties shall bear equally any fees and costs that may be imposed by the New York Court of Appeals in connection with this certification. This panel retains jurisdiction for purposes of resolving this

appeal once the New York Court of Appeals has responded to our certification.

## CERTIFICATE

The foregoing is hereby certified to the New York Court of Appeals pursuant to 22 N.Y.C.R.R. § 500.27(a) and 2d Cir. R. 27.2(a), as ordered by the United States Court of Appeals for the Second Circuit.