*Ojeda v. MTA*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2021
No. 20-2768

**DOMINGO OJEDA,**
*Plaintiff-Appellee,*

v.

**METROPOLITAN TRANSPORTATION AUTHORITY,**
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MARCH 16, 2022
DECIDED: JULY 19, 2022

Before:     POOLER, WESLEY, and MENASHI, *Circuit Judges.*

Domingo Ojeda, a police officer for the Metropolitan Transportation Authority ("MTA"), sued the MTA under the Federal Employers' Liability Act ("FELA"), alleging that the MTA negligently failed to provide him with a safe workplace when it sent him on patrol in a vehicle without a prisoner compartment. A jury found the MTA

liable and awarded Ojeda damages. The MTA moved for judgment as a matter of law notwithstanding the verdict, arguing that it is immune from liability pursuant to the governmental function defense and that the evidence was insufficient to support the verdict because it lacked expert testimony. The U.S. District Court for the Southern District of New York denied that motion, holding that the governmental function defense does not apply in FELA cases.

We hold that the FELA does not abrogate the governmental function defense, and therefore the defense is available in FELA cases. The defense does not apply on the merits in this case, however, because the MTA has failed to show that it performed a discretionary governmental function when committing the allegedly negligent acts. Additionally, we hold that expert testimony was not required in this case. We affirm the judgment of the district court.

———————

PHILIP J. DINHOFER, Philip J. Dinhofer LLC, Rockville Centre, NY, *for Plaintiff-Appellee*.

BECK S. FINEMAN, Ryan Ryan Deluca LLP, Bridgeport, CT, *for Defendant-Appellant*.

———————

MENASHI, *Circuit Judge*:

Plaintiff-Appellee Domingo Ojeda was employed as a police officer by the Metropolitan Transportation Authority ("MTA"), the defendant-appellant in this case. While patrolling a railroad station, Ojeda witnessed an incident between a man and a woman in the station's parking lot. After intervening and discovering that the man

had an open order of protection against him, Ojeda handcuffed the man. The arrestee fled, and Ojeda injured himself in pursuit.

Ojeda sued the MTA under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, alleging that the MTA's negligence—including its failure to provide him with a prisoner compartment in his patrol car—caused his injuries. A jury ruled in favor of Ojeda and awarded him damages. On appeal, the MTA argues that it is immune from liability pursuant to the governmental function defense and that, in any event, it cannot be held liable without expert testimony. The district court rejected these arguments when it denied the MTA's motion for judgment as a matter of law. We affirm.

## BACKGROUND

The MTA was created under New York law as "a body corporate and politic constituting a public benefit corporation." N.Y. Pub. Auth. L. § 1263. Its purpose is "the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district." *Id.* § 1264. Metro-North Commuter Railroad Company ("Metro-North") is a subsidiary of the MTA. N.Y. Comp. Codes R. & Regs. tit. 21, § 1085.1(a). Metro-North "operates and maintains the Hudson, Harlem, New Haven, Port Jervis and Pascack Valley commuter railroad lines." *Id.* § 1085.2(g).

The MTA is "authorized and empowered, to provide and maintain an authority police department and a uniformed authority police force." N.Y. Pub. Auth. L. § 1266-h. According to statute, "[e]ach member of such uniformed police force shall be a 'police officer' for the purposes of the criminal procedure law, with all of the powers of such police officers thereunder." *Id.* The MTA police may

3

"enforce and prevent violation of all laws and ordinances" "in and about any or all of the facilities owned, occupied and/or operated by the [MTA] and its subsidiary corporations." *Id.*

In 2003, Ojeda joined the MTA police and attended the New York Police Department academy for six months for basic training. In the first part of his thirteen-year career as an MTA police officer, Ojeda worked in the patrol unit. He then joined the emergency services unit ("ESU"), a unit within the police department that, according to Ojeda, "responds to a higher problematic situation that is beyond the scope of the regular police officer." App'x 106-07. Such situations include "barricaded subjects," "emotionally disturbed persons," "extrication from vehicles," and "anything that uses specialized tools or is beyond the capacity of the police officer to handle." *Id.* at 107. To serve in the ESU, Ojeda had to undergo specialized training.

On a typical day, ESU officers are assigned to a particular region of the metro system and either make themselves available for a regular patrol officer's request for assistance or conduct patrol themselves. The standard vehicle provided to ESU officers is a truck with a utility body attached to it. The utility body's contents include medical emergency equipment, protective suits, vehicle extrication equipment, and rope rescue equipment. The truck is not equipped to transport people placed in custody. Instead, if an ESU officer makes an arrest, he must request assistance from another patrol unit to transport the arrestee.

Ojeda and his partner, Officer Gregg Cella, were assigned to patrol Harrison Station, a commuter rail stop on Metro-North's New Haven Line, on the night of October 2, 2013. About two hours into

4

their patrol, they spotted a vehicle enter the station's parking lot with a female driver and a male passenger. Both occupants exited the car, and the man reentered the car to sit in the driver's seat. As the woman reached into the car on the passenger side—with the door open—the man drove the car in reverse. As Ojeda tells it, "[t]he door knock[ed] her down and the door literally [went] right over her head." *Id.* at 121.

Ojeda left his own vehicle to address the situation, and Cella followed him. Ojeda directed the driver to pull the car over to the curb, and Ojeda turned off the engine and removed the keys. He then brought the man to the rear of the car and began questioning him. He learned that the man and the woman had a child together. Ojeda also noticed that the woman was "up and screaming and yelling with" Cella and that she "was speaking in both Spanish and English." *Id.* at 123-24.

Because Ojeda spoke Spanish, he traded places with Cella and began questioning the woman. She claimed that there was an order of protection against the man. Ojeda told Cella what the woman said, which prompted Cella to search for any outstanding warrants or orders of protection using the man's driver's license. That review confirmed that there was an open order of protection, and Ojeda proceeded to place the man in handcuffs and arrest him. Ojeda secured the arrestee by holding onto the handcuffs while Cella communicated with dispatch.[1]

At that point, the woman began talking with the man. Ojeda told them to stop speaking with each other. The man asked Ojeda to

---

[1] According to Ojeda, Cella was ten to fifteen feet away from Ojeda when he spoke with dispatch on his cell phone. Ojeda also asserts that Cella was on an unrelated second phone call right after he spoke with dispatch.

loosen the handcuffs. Ojeda requested that the man call him "sir or officer" and said that "officer works," and the man began to refer to Ojeda as "Officer Works." App'x 130. Now suspecting that the man was under the influence, Ojeda turned to the woman and asked if he had a history of using drugs. The woman responded that he did.

Ojeda let go of the handcuffs to approach the woman and ask what drugs the man had been using. At that point, the man took off running. Ojeda pursued him on foot, but as he passed the ESU truck, he felt a "pop" in his leg and slowed down. *Id.* at 131. As the man disappeared, Ojeda encountered another police officer, who called backup to assist in a search. (The search was unsuccessful, but the following day the man turned himself in.)

After backup arrived, Ojeda remained at the scene for another three-and-a-half hours to search for his prisoner. Later that night, he drove himself to a hospital, where doctors determined that he may have torn his Achilles tendon. Because of his injury, Ojeda was placed on restricted duty. After nearly a year passed without a full recovery, Ojeda underwent surgery in September 2014. The following year, the MTA police chief marked Ojeda as "disabled" for pension purposes. Five months later, his employment with the MTA was terminated.

Ojeda filed a complaint against the MTA under the FELA, alleging that the MTA's negligence caused his injuries. Specifically, Ojeda alleged that the MTA negligently (1) failed "to provide the plaintiff with the necessary and proper tools and equipment with which to work," (2) failed "to provide [Ojeda] with an appropriate and timely backup," and (3) "provid[ed] plaintiff with a police partner who left plaintiff alone to manage with two persons." Am. Compl. ¶ 21, *Ojeda v. MTA*, 477 F. Supp. 3d 65 (S.D.N.Y. 2020) (No.

6

16-CV-3), ECF No. 29. In connection with his injuries, Ojeda sought $5 million in damages.

Before trial commenced, the MTA moved in limine to exclude evidence regarding the MTA's decision to assign the ESU vehicle to Ojeda and regarding Cella's alleged negligence. *See* Motions in Limine, *Ojeda*, 477 F. Supp. 3d 65, ECF Nos. 103, 104. According to the MTA, the governmental function defense protected it from liability based on its decisions to issue Ojeda equipment or to assign Cella as his partner. The MTA also argued that those claims would require expert evidence, which Ojeda failed to produce. The district court declined to decide whether the governmental function defense is available in a FELA case, but it granted the MTA's motion insofar as Ojeda was not allowed to "testify about the MTA's official policies and practices of assigning police officers to a specific patrol car" or to "state whether Officer Cella acted negligently during the encounter based on the MTA's official policies and practices of detaining an arrestee." App'x 83. However, Ojeda was permitted to "testify about his experience of being assigned to a patrol car as well as what he saw Officer Cella doing during the arrest so long as his testimony is based on his own observations and experiences." *Id.* at 83-84.

The case went to trial, and the only testimony came from Ojeda, Ojeda's treating orthopedist, and Cella. At trial, the parties stipulated that the MTA "does not study response time to requests for backup calls." Trial Transcript at 99, *Ojeda*, 477 F. Supp. 3d 65. Before the case was submitted to the jury, the MTA moved for a directed verdict and reiterated its arguments that Ojeda could not establish liability without expert testimony and that it was immune from liability pursuant to the governmental function defense. The district court

7

denied the motion. Although the district court "agree[d] … that there's not a wealth of evidence in this case on certain things," it decided "there's enough to go to the jury." App'x 152. As to the governmental function defense, the district court stated that "[w]hen looking at the case law, it is not clear that it even applies to a FELA case." *Id.* at 151.

The jury found that Ojeda had proven by a preponderance of the evidence that the MTA "was negligent in failing to provide a safe place to work on October 2, 2013," and that such negligence "caused, in whole or in part, [the] injury to" Ojeda. Verdict at 1, *Ojeda*, 477 F. Supp. 3d 65, ECF No. 138. Additionally, the jury determined that eighty percent of Ojeda's damages resulted from his own negligence. *Id.* at 2. Because the jury found that Ojeda's total damages were $2,650,000, judgment was entered in favor of Ojeda for a total award of $530,000. Judgment at 1-3, *Ojeda*, 477 F. Supp. 3d 65, ECF No. 139.

The MTA renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 for the same reasons it articulated in its motions in limine and its motion for a directed verdict. The district court denied the motion and again rejected the MTA's arguments. *Ojeda*, 477 F. Supp. 3d at 73-76. First, the district court concluded that, despite the lack of expert testimony, "the evidence presented at trial was sufficient to support the jury's finding that [the MTA] was 20% negligent for failing to provide [Ojeda] with a reasonably safe place to work under FELA." *Id.* at 75. Second, the district court rejected the MTA's argument that the governmental function defense shields the MTA from liability in this case. *Id.* at 76. This time, the district court was less circumspect; it held that "the

8

governmental function defense does not apply in FELA cases, and that the MTA is not entitled to immunity under such a defense." *Id.*

The MTA timely appealed.

## DISCUSSION

"We review *de novo* the district court's decision on a motion for judgment as a matter of law, applying the same standard that is required of the district court." *Smalls v. Collins*, 10 F.4th 117, 131 (2d Cir. 2021) (internal quotation marks omitted). "[W]e are required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Black v. Finantra Cap., Inc.*, 418 F.3d 203, 208-09 (2d Cir. 2005) (internal quotation marks omitted). When reviewing a district court's denial of a Rule 50 motion, we "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute [our] judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)).

The MTA raises two arguments on appeal. First, it contends that the governmental function defense shields the MTA from liability for its decision to send Ojeda on patrol in a truck without a prisoner compartment, its decision to assign him Cella as a partner, and its failure to study backup response times. Second, the MTA in the alternative argues that the district court erred in permitting a jury to find negligence on the part of the MTA without expert testimony. We address these arguments in turn.

9

**I**

First, the MTA argues that the governmental function defense shields it from liability in this case. In the MTA's view, the alleged negligence occurred in "the exercise of police discretion," which as a "quintessential governmental function[]" cannot form the basis of liability for negligence. Appellant's Br. 16-17. Ojeda contends—and the district court held—that the FELA bars the MTA from asserting the governmental function defense. We hold that the governmental function defense remains available in FELA suits, but it offers no relief to the MTA in this case.

**A**

We begin with whether the MTA may claim the governmental function defense in FELA cases.[2] The FELA provides that "[e]very common carrier by railroad while engaging in commerce between any of the several States or Territories … shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce … for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. "In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Tufariello v. Long Island R.R.*, 458 F.3d 80, 87 (2d Cir. 2006).

---

[2] As a general matter, the MTA is a governmental entity entitled to invoke the governmental function defense. *See Doe v. City of New York*, 890 N.Y.S.2d 548, 550 (N.Y. App. Div. 2d Dep't 2009) (holding the MTA to be "immune from negligence claims arising out of the performance of [its] governmental functions").

Though a FELA action may resemble a traditional negligence claim, "the plaintiff's burden in making a showing of causation and negligence is lighter under FELA than it would be at common law because 'the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues.'" *Id.* (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 438-39 (1958)). The FELA "does not define negligence, leaving that question to be determined … by the common law principles as established and applied in the federal courts." *Urie v. Thompson*, 337 U.S. 163, 174 (1949) (internal quotation marks omitted). In other words, "[w]hat constitutes negligence for the statute's purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes. Federal decisional law formulating and applying the concept govern." *Id.*; *see also id.* ("*Erie R. Co. v. Tompkins*, 304 U.S. 64[ (1938)], has no application.").

At the same time, the Supreme Court "ha[s] made clear" that what constitutes negligence under the FELA "generally turns on principles of common law." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). The statute "is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms." *Urie*, 337 U.S. at 182. Accordingly, the Supreme Court has directed us to approach interpretation of the FELA in two steps. First, "we must look to FELA itself, its purposes and background, and the construction we have given it over the years." *Gottshall*, 512 U.S. at 541. Second, "because FELA jurisprudence gleans guidance from common-law developments, we must consider the common law's treatment of the right of recovery asserted" by the plaintiff. *Id.* at 541-42 (internal quotation marks and

11

citation omitted). "[A]lthough common-law principles are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis." *Id.* at 544; *see also id.* ("Only to the extent of … explicit statutory alterations is FELA an avowed departure from the rules of the common law.") (internal quotation marks omitted).

Applying that analysis, we hold that the governmental function defense remains available in FELA cases. There is no dispute that the governmental function defense is a creature of the common law. In *Gottshall*, the Supreme Court drew on the common law to define the right to recover under the FELA for negligently inflicted emotional distress. *Id.* at 544-49. It reasoned that "because negligent infliction of emotional distress is not explicitly addressed in the statute, the common-law background of this right of recovery must play a vital role in giving content to the scope of an employer's duty under FELA to avoid inflicting emotional injury." *Id.* at 551. In this case, though the FELA expressly abrogates the common-law defenses of contributory negligence and assumption of risk,[3] the statute says nothing about the governmental function defense. Therefore, as in *Gottshall*, the common-law background means that the governmental function defense remains available in FELA cases.

Ojeda argues that we should understand 45 U.S.C. § 55 expressly to displace the governmental function defense. That section provides that "[a]ny contract, rule, regulation, or device whatsoever,

---

[3] *See* 45 U.S.C. § 53 ("[T]he fact that the employee may have been guilty of contributory negligence shall not bar a recovery."); *id.* § 54 ("In any action brought [under the FELA], [an] employee shall not be held to have assumed the risks of his employment.").

12

the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void." According to Ojeda, the governmental function defense is a "device" within the meaning of § 55 because that section bars "anything" a railroad might use "to evade its liability under the FELA." Appellee's Br. 29.

We disagree that § 55 can be read so broadly. The Supreme Court has already "'cataloged' the ways in which FELA expressly departed from the common law: It abolished the fellow servant rule, rejected contributory negligence in favor of comparative negligence, prohibited employers from contracting around the Act, and abolished the assumption of risk defense." *Norfolk S. Ry. v. Sorrell*, 549 U.S. 158, 168 (2007) (quoting *Norfolk & W. R. Co. v. Ayers*, 538 U.S. 135, 145 (2003)). As noted above, "unless [common-law principles] are expressly rejected in the text of the [FELA], they are entitled to great weight." *Gottshall*, 512 U.S. at 544. Ojeda's interpretation of "device" as including every common-law defense against liability contradicts that presumption. *See also Nordgren v. Burlington N. R.R.*, 101 F.3d 1246, 1251 (8th Cir. 1996) (holding that "any device whatsoever" in 45 U.S.C. § 55 "refers only to any other creative agreements or arrangements the railroad might come up with to exempt itself from liability").

We conclude that the governmental function defense remains available in cases brought under the FELA.

**B**

That the MTA may claim the governmental function defense in FELA suits, however, does not mean it avoids liability in this case. Because the governmental function defense is an affirmative defense,

13

*see Ferreira v. City of Binghamton*, 975 F.3d 255, 284 (2d Cir. 2020), the MTA must show its entitlement to the defense's protection. To that end, the MTA argues that its actions are protected under "the common-law doctrine of governmental immunity" that "shield[s] public entities from liability for discretionary actions taken during the performance of governmental functions." *Valdez v. City of New York*, 18 N.Y.3d 69, 75-76 (2011).

In *Owen v. City of Independence*, 445 U.S. 622, 644-50 (1980), the Supreme Court described the common law as affording municipalities immunity from tort liability by reference to two distinctions. First, under the "governmental-proprietary distinction," a municipality is liable under ordinary tort principles when "performing the same 'proprietary' functions as any private corporation," but it is immune when "acting in [a] 'governmental' or 'public' capacity." *Id.* at 645. Second, under the ministerial-discretionary distinction, a municipality is protected from "suits … either for the non-exercise of, or for the manner in which in good faith it exercises, *discretionary powers* of a public or legislative character" but not from suits for activities that are "ministerial in nature." *Id.* at 644, 648 (internal quotation marks omitted). Thus, to evaluate whether the governmental function defense applies, we ask two questions. First, was the municipality engaged in a proprietary or a governmental function? Second, if it was engaged in a governmental function, was it exercising discretionary authority or performing a ministerial duty? Only a governmental function performed through discretionary authority receives the protection of the defense.[4]

---

[4]  *See* 6 Eugene McQuillin, Treatise on the Law of Municipal Corporations § 2628 (1913) ("As a branch of the rule of nonliability of municipalities for

14

Courts in this circuit have had few occasions to explore when a municipality may be liable to its police officers under the FELA. This court approached the issue in *Greene v. Long Island R.R.*, an interlocutory appeal of the district court's decision that the MTA was a "common carrier by railroad" within the meaning of the FELA. 280 F.3d 224, 226 (2d Cir. 2002). The case arose from an MTA police officer's suit against the MTA for being "negligent in failing to provide Greene with safe working conditions, including by failing to equip the jeep with a siren and adequate emergency lights and flashers." *Id.* at 227. This court agreed with the district court that the MTA was a common carrier under the FELA but "express[ed] no view as to whether Greene was injured … by reason of any defect or insufficiency, due to MTA's negligence, in its equipment." *Id.* at 240. On remand, the parties in *Greene* settled before the district court reached the merits. Order of Discontinuance, *Greene v. Long Island R.R.*, No. 98-CV-4316 (E.D.N.Y. Dec. 3, 2003), ECF No. 66.[5]

---

torts in connection with the exercise of *governmental* functions, is the rule which distinguishes (1) ministerial duties from (2) legislative, judicial and discretionary functions."); *see also* Restatement (Second) of Torts § 895C cmt. g (1979) (observing that "discretionary function" immunity "is based on the theory that some governmental functions are of a type that should not be subject to review and second-guessing by the courts in a tort action"); *Ferreira*, 975 F.3d at 283 n.10 ("When a municipality is engaged in a 'proprietary' rather than a 'governmental' role, it is subject to the ordinary rules of negligence that apply to private parties, so that neither discretionary immunity nor the special duty rule apply.") (describing New York law).

[5] State court cases in which police officers have sued the MTA for negligence under the FELA have been similarly inconclusive. Such suits have been dismissed for failure to show negligence with no suggestion that the claims would be barred by the governmental function defense. *See*

As noted above, what constitutes negligence under the FELA is a federal question that depends on the common law generally rather than on "differing conceptions of negligence applicable under state and local laws." *Urie*, 337 U.S. at 174. The MTA, however, argues that it is entitled to the governmental function defense as defined by New York courts. We need not decide the exact contours of the governmental function defense under the FELA because the MTA cannot succeed even under its assumption that we should look primarily to New York law to describe the scope of the defense.

**1**

Under New York law, "[w]hen a negligence claim is asserted against a municipality, the first issue for a court to decide is whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose." *Turturro v. City of New York*, 28 N.Y.3d 469, 477 (2016) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425 (2013)). "If the municipality's actions fall in the proprietary realm, it is subject to suit under the ordinary rules of negligence applicable to nongovernmental parties." *Applewhite*, 21 N.Y.3d at 425.

---

*Curley v. Consol. R. Corp.*, 81 N.Y.2d 746, 747-48 (1992) (dismissing suit alleging a defective police car because the "plaintiff's evidence is insufficient as a matter of law, without total speculation, to permit the inference that any negligent act or omission on Conrail's part caused his injuries") (citation omitted); *Cruz v. MTA*, 963 N.Y.S.2d 18, 19 (N.Y. App. Div. 1st Dep't 2013) (dismissing suit alleging injuries incurred after the MTA negligently summoned the officer to the scene of an assault because "[t]here is no reasonable basis for finding that there was any negligence on the MTA's part that contributed to [the] plaintiff's injuries").

16

The defense is therefore available only if the MTA was engaged in a governmental function. "A government entity performs a purely proprietary role when its activities essentially substitute for or supplement traditionally private enterprises." *Id.* (internal quotation marks omitted). By contrast, "a municipality will be deemed to have been engaged in a governmental function when its acts are undertaken for the protection and safety of the public pursuant to the general police powers." *Id.* (internal quotation marks omitted). Because such functions exist on a "continuum," the "relevant inquiry in determining whether a governmental agency is acting within a governmental or proprietary capacity is to examine the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred." *In re World Trade Ctr. Bombing Litig.*, 17 N.Y.3d 428, 446-47 (2011) (internal quotation marks omitted).

"Police protection" is a "quintessential example of a governmental function." *Id.* at 448. That function "involves the provision of a governmental service to protect the public generally from external hazards and particularly to control the activities of criminal wrongdoers." *Riss v. City of New York*, 22 N.Y.2d 579, 581 (1968). Because "[t]he amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed," tort liability based on the failure to provide adequate police protection "could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits." *Id.* at 581-82.

Though this case involves the police, Ojeda does not allege that the MTA failed adequately "to protect the public." *Id.* at 581. Instead, Ojeda's claim is that the MTA, in assigning him a patrol car without a prisoner compartment, failed to provide him with a safe workplace or with proper equipment. The claim is not based on the MTA's duties as a governmental entity providing police protection but on the MTA's duties as an employer providing safe working conditions to its employees. When acting as an employer, the MTA "is bound … to the exercise of reasonable care in providing [its] employee with a safe place in which to work, with proper and adequate tools, appliances and machinery, and with fellow-employees competent for the tasks to which they are assigned." *Marceau v. Rutland R.R. Co.*, 211 N.Y. 203, 209 (1914). For that reason, courts have departed from the general rule of nonliability when a "particular act, although in connection with a governmental function, was itself a corporate duty, so as to render the municipality liable to employees for injuries received." 6 McQuillin, *supra* note 4, § 2620. [6] In this way, "the varied functions of a governmental entity can be interspersed with both governmental and proprietary elements." *World Trade Ctr.*, 17 N.Y.3d at 447.

The jury found, based on the vehicle, partner, and backup the MTA provided to Ojeda, that the MTA "was negligent in failing to

---

[6] *See also* 63 C.J.S. *Municipal Corporations* § 883 (2022) ("Although the organization and maintenance of a fire department are generally regarded as governmental duties, a municipality is generally held liable in the case of a firefighter injured by defective appliances of the department or by the negligence of others therein in the performance of the firefighter's duties.") (footnote omitted); *MacClave v. City of New York*, 265 N.Y.S.2d 222, 224 (N.Y. App. Div. 1st Dep't 1965) (affirming a jury verdict against the city for negligently furnishing a mask to a firefighter that was "dangerous to use for general fire-fighting purposes").

provide a safe place to work on October 2, 2013." Verdict, *supra*, at 1. In its decisions regarding the state of Ojeda's workplace, the MTA was engaged in a proprietary rather than governmental function. It therefore cannot establish a governmental function defense for that conduct.[7]

**2**

Even if the MTA were engaged in a governmental function when it provided Ojeda a partner, backup, and a patrol car without a prisoner compartment, it still would need to show that its decision was a "discretionary action[]."*Valdez*, 18 N.Y.3d at 75-76. Under New York law, "[a] public employee's discretionary acts—meaning conduct involving the exercise of reasoned judgment—may not result in the municipality's liability even when the conduct is negligent." *Lauer v. City of New York*, 95 N.Y.2d 95, 99 (2000). "In other words, even if a plaintiff establishes all elements of a negligence claim, a state or municipal defendant engaging in a governmental function can avoid liability if it timely raises the defense and proves that the

---

[7] Employees such as Ojeda are not limited to bringing safe workplace suits against their municipal employers. "An employee may recover merely as an individual, on the ground of negligence, in a proper case, without in any way relying on the liability of a master for injuries to his servant." 6 McQuillin, *supra* note 4, § 2620. We need not decide the extent to which the governmental function defense would defeat a FELA claim that in substance asserted the employee's rights as a member of the public. In this case, Ojeda's amended complaint brought claims that no member of the public could bring—that the MTA failed "to provide [Ojeda] with the necessary and proper tools and equipment with which to work," failed "to provide [Ojeda] with an appropriate and timely backup," and "provid[ed] [Ojeda] with a police partner who left plaintiff alone to manage with two persons." Am. Compl., *supra*, ¶ 21.

19

alleged negligent act or omission involved the exercise of discretionary authority." *Valdez*, 18 N.Y.3d at 76.

New York's protection for discretionary acts is not unlimited. "[T]he governmental function immunity defense cannot attach unless the municipal defendant establishes that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated." *Id.* When, "viewing the record as a whole," the plaintiff's claim "essentially arises from a misjudgment that was discretionary," New York courts hold that the municipality is entitled to immunity. *Mon v. City of New York*, 78 N.Y.2d 309, 315 (1991).[8] When "there is no evidence" that the municipality "exercised … discretion" or "made a judgment of any sort," New York courts hold that governmental function immunity does not apply. *Haddock v. City of New York*, 75 N.Y.2d 478, 485 (1990).[9]

---

[8] *See also Johnson v. City of New York*, 15 N.Y.3d 676, 681 (2010) (holding that the governmental function defense barred a claim arising from a stray bullet fired by police because "on this record … it cannot be said that the officers failed to exercise discretion in discharging their weapons"); *Devlin v. City of New York*, 148 N.Y.S.3d 149, 151-52 (N.Y. App. Div. 2d Dep't 2021) (granting summary judgment to the city because "[t]he evidence … demonstrated that the officers' decision involved reasoned judgment and an exercise of discretion").

[9] *See also Stevens v. Town of E. Fishkill Police Dep't*, 156 N.Y.S.3d 288, 290 (N.Y. App. Div. 2d Dep't 2021) (affirming the denial of a town's motion to dismiss because it "failed to establish, prima facie, … that the officers' actions were discretionary, meaning conduct involving the exercise of reasoned judgment"); *Santaiti v. Town of Ramapo*, 80 N.Y.S.3d 288, 296 (N.Y. App. Div. 2d Dep't 2018) (affirming the denial of a town's motion to dismiss because "it cannot be said, as a matter of law, that the discretion possessed by the Town was in fact exercised") (internal quotation marks and alteration omitted).

In this case, the MTA has failed to establish that it exercised its discretion when, without studying backup response times, it assigned Ojeda to patrol with Cella in a vehicle without a prisoner compartment. Given that discretionary immunity is an affirmative defense, *Ferreira*, 975 F.3d at 270, a municipal defendant must "demonstrate[] its prima facie entitlement to judgment as a matter of law by establishing, among other things, that … [its] decision constituted a discretionary act involving the exercise of reasoned judgment," *Heckel v. City of New York*, 875 N.Y.S.2d 217, 218 (N.Y. App. Div. 2d Dep't 2009). As Ojeda notes, the MTA "does not discuss … what policies were at issue, nor does it tie those policies to any kind of evidence whatsoever showing that discretionary acts were actually performed." Appellee's Br. 27. The MTA's motion in limine provides only a conclusory assertion that "the MTA exercised discretion in procuring its vehicle fleet and in assigning officers to various duties during any particular shift." Motion in Limine at 3, *Ojeda*, 477 F. Supp. 3d 65, ECF No. 103. In sum, the MTA has not demonstrated that it exercised its "reasoned judgment" when assigning vehicles for patrol or otherwise affecting Ojeda's workplace. *Heckel*, 875 N.Y.S.2d at 218.

The MTA relies on *McCormack v. City of New York*—in which the court dismissed a wrongful death claim based on the city's provision of a faulty bullet-proof vest to the decedent police officer as barred by the governmental function defense—for the proposition that it cannot be held liable for torts relating to a police department's choice of equipment. 80 N.Y.2d 808, 810 (1992). We disagree that *McCormack* stands for so broad a proposition. Unlike in this case, the municipal defendant in *McCormack* met its burden of showing that it exercised its discretion. As the court noted in that case, "the evidence at trial

21

showed" that "the more protective devices available on the market afford reduced mobility, a disadvantage that might well lead City officials to choose [the bullet-proof vest at issue] over the alternatives." *Id.* at 811. The municipality therefore showed that it had made a reasoned judgment in its choice of equipment.

In order to establish a governmental function defense, a municipality must demonstrate that its action involved "the exercise of discretion or expert judgment in policy matters." *Id.* at 811 (quoting *Haddock*, 75 N.Y.2d at 484). The MTA has not done so in this case, and therefore the governmental function defense does not bar Ojeda's suit.[10]

## II

Second, the MTA argues that the district court erred in permitting the jury to find liability without expert testimony on the standard of care. "[T]he trial judge has broad discretion in the matter

---

[10] To the extent that the jury attributed Cella's negligent conduct to the MTA—as opposed to finding the MTA negligent for assigning Cella as a partner—the governmental function defense does not bar this aspect of Ojeda's claim either. Insofar as Ojeda alleged that Cella's conduct made it harder for Ojeda safely to perform his work, he did so in the context of his safe workplace claim, which as explained above implicates a proprietary duty. *See supra* Part I.B.1.; *see also Buckley v. City of New York*, 56 N.Y.2d 300, 302 (1982) (upholding a jury verdict finding the city liable for its police officer negligently shooting a fellow police officer). Moreover, the MTA did not request a special verdict or interrogatory and did not otherwise object to the verdict form. It has therefore waived the general-verdict rule. *Morse v. Fusto*, 804 F.3d 538, 551-52 (2d Cir. 2015). Because there are multiple bases to support the jury's verdict apart from Cella's negligence, the MTA would not be entitled to a new trial even if it could not be held liable for Cella's negligence.

of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962). The MTA contends that the district court abused that discretion because the jury needed expert testimony to evaluate the choice to assign Ojeda a patrol car without a prisoner compartment, the assignment of Cella as Ojeda's partner, and the failure to study backup response times.

"[C]auses of action in which the law predicates recovery upon expert testimony" are "rare." *Id.* "It is well settled that expert testimony is unnecessary in cases where jurors are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (internal quotation marks omitted). We require expert evidence only when a necessary element of the claim "would not be obvious to the lay juror." *Id.* Thus, we have held that expert testimony was required to establish "the causal link between exposure to toxins and other behavior and squamous cell carcinoma" for a Jones Act claim. *Id.* We have also suggested that "special expertise" was necessary when a claim involved "esoteric" injuries such as "dyscalculia and spelling dyspraxia." *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 59 (2d Cir. 1996) (discussing *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499 (9th Cir. 1994)). Conversely, we have held that expert testimony was unnecessary in a dispute over whether "prolonged exposure to paint fumes would cause headache, nausea, and dizziness." *Id.* at 59-60.

The district court did not manifestly err in allowing this case to be submitted to the jury without expert testimony. In *Spokane & Inland Empire R.R. Co. v. United States*, the Supreme Court affirmed a jury's

23

verdict finding that the safety measures placed on a train were an inadequate substitute for the statutorily required handholds and grab-irons. 241 U.S. 344, 347-51 (1916). The railroad argued that the jury should not be permitted to make a finding on that issue without expert testimony. *Id.* at 351. The Supreme Court disagreed, holding that "the question" of whether the train was adequately equipped "was not one for experts and that the jury after hearing the testimony and inspecting the openings were competent to determine the issue." *Id.* Likewise, the Supreme Court in *Salem* permitted a jury to find— after hearing testimony and viewing photographs—that a shipowner was negligent for "having failed to provide railings or other safety devices" without the aid of expert testimony. 370 U.S. at 34 (internal quotation marks omitted). Because "the potential danger was fairly obvious and a jury should be perfectly competent to decide whether the handholds furnished were sufficient to discharge the owner's duty to provide his seamen with a safe place to work," the Supreme Court held that the jury's verdict "hardly require[d] expert knowledge of naval architecture." *Id.* at 36-37 (quoting *Salem v. United States*, 293 F.2d 121, 126 (2d Cir. 1961) (Smith, J., dissenting)).

As in *Salem*, the "potential danger" of failing to provide Ojeda with a prisoner compartment, a capable partner, or timely backup was "fairly obvious." *Id.* The jury in this case was equipped to evaluate the MTA's actions in sending Ojeda on patrol with Cella in a vehicle lacking a prisoner compartment and without studying backup response times. Those judgments are not the sort that we have held requires expert knowledge. We will not reverse the jury's verdict in this case solely for lack of expert testimony.

**CONCLUSION**

A different jury might have reached a different verdict in this case. But in FELA cases "the role of the jury is significantly greater than in common law negligence actions," and its "right to pass upon the question of the employer's liability must be most liberally viewed." *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 84 (2d Cir. 1989) (internal quotation marks and alteration omitted). We may reverse the denial of a motion for judgment notwithstanding the verdict only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970).

Though the governmental function defense was available for the MTA to assert, the MTA failed to show that the defense barred liability in this case. Additionally, we cannot say that the evidence supporting the jury's verdict for Ojeda was legally insufficient. We therefore **AFFIRM** the judgment of the district court.

25